## POULOS v. NEW HAMPSHIRE.

No. 341.   Argued February 3, 1953.—Decided April 27, 1953.

*Hayden C. Covington* argued the cause and filed a brief for appellant.

*Gordon M. Tiffany* argued the cause for appellee. With him on the brief were *Louis C. Wyman,* Attorney General of New Hampshire, and *Henry Dowst, Jr.,* Assistant Attorney General. *Mr. Tiffany,* then Attorney General of New Hampshire, was also on a Statement Opposing Jurisdiction and a Motion to Dismiss or Affirm.

MR. JUSTICE REED delivered the opinion of the Court.

This appeal presents the validity of a conviction of appellant for conducting religious services in a public park of Portsmouth, New Hampshire, without a required license, when proper application for the license had been arbitrarily and unreasonably refused by the City Council. The conclusion depends upon consideration of the prin-

ciples of the First Amendment secured against state abridgment by the Fourteenth.[1]

Appellant is one of Jehovah's Witnesses. Permission for appellant and another Witness, now deceased, was sought to conduct services in Goodwin Park on June 25 and July 2. They offered to pay all proper fees and charges, and complied with the procedural requirements for obtaining permission to use the park. When the license was refused on May 4, appellant nevertheless held the planned services and continued them until arrested. He was charged with violation of § 22 of the city ordinance set out below.[2] On conviction in the Municipal Court he was fined $20 and took an appeal which entitled him to a plenary trial before the Superior Court. Before that trial appellant moved to dismiss the complaints on the

---

[1] *Schneider* v. *State,* 308 U. S. 147, 160.

Constitution, First Amendment:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

*Id.,* Fourteenth Amendment:

". . . No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

[2] "Section 22. License Required. No theatrical or dramatic representation shall be performed or exhibited and no parade or procession upon any public street or way, and no open air public meeting upon any ground abutting thereon shall be permitted unless a license therefor shall first be obtained from the City Council.

"Section 23. License Form. Every such license shall be in writing and shall specify the day and hour of the permit to perform or exhibit, or of such parade, procession or open air public meeting.

"Section 24. Fee. The fee for such license shall be not more than Three Hundred Dollars for each day such licensee shall perform

ground that "the ordinance as applied was unconstitutional and void." This motion on the constitutional question, pursuant to New Hampshire practice, was transferred to the Supreme Court. It ruled, as it had on a former prosecution under a different clause of an identical section, so far as pertinent, of a New Hampshire statute, against one Cox, *State* v. *Cox,* 91 N. H. 137, 143, 16 A. 2d 508, 513, that:

"The discretion thus vested in the authority [city council] is limited in its exercise by the bounds of reason, in uniformity of method of treatment upon the facts of each application, free from improper or inappropriate considerations and from unfair discrimination. A systematic, consistent and just order of treatment, with reference to the convenience of public use of the highways, is the statutory mandate. The licensing authority has no delegation of power in excess of that which the legislature granting the power has and the legislature attempted to delegate no power it did not possess." *State* v. *Derrickson,* 97 N. H. 91, 93, 81 A. 2d 312, 313.

In *Cox* v. *New Hampshire,* 312 U. S. 569, we affirmed on appeal from the New Hampshire conviction of Cox, acknowledging the usefulness, p. 576, of the state court's carefully phrased interpretive limitation on the licensing authority. The Supreme Court of New Hampshire went on to hold the challenged clause in this present prosecution valid also in these words:

"The issue which this case presents is whether the city of Portsmouth can prohibit religious and church

or exhibit or such parade, procession, or open air public meeting shall take place, but the fee for a license to exhibit in any hall shall not exceed Fifty Dollars.

"Section 25. Penalty. Any person who violates section 22 of this Article shall be fined Twenty Dollars."

meetings in Goodwin Park on Sundays under a licensing system which treats all religious groups in the same manner. Whether a city could prohibit religious meetings in all of its parks is a doubtful question which we need not decide in this case. What we do decide is that a city may take one of its small parks and devote it to public and nonreligious purposes under a system which is administered fairly and without bias or discrimination." 97 N. H., at 95, 81 A. 2d, at 315.

Thereupon it discharged the case.

The result of this action was to open the case now here in the Superior Court for trial. At the conclusion of the evidence, appellant raised federal issues by a motion to dismiss the complaint set out below.[3] The Superior Court passed upon the issues raised. It held that *Cox* v. *New Hampshire,* 312 U. S. 569, determined the validity of the section of the ordinance under attack; that the

---

[3] "1. The undisputed evidence shows that the members of the city council and the city council itself acted arbitrarily, capriciously and without support of law and of fact when they denied the application made by Jehovah's witnesses in behalf of the defendants to deliver the public talks upon the occasions in question.

"2. The undisputed evidence shows that the park in question is a public park, dedicated as such without any limitations in the deed of dedication or in the ordinances of the City of Portsmouth and the defendants had the legal right to deliver the talks in the park and it was the duty of the city council to issue to the defendants permits to use the public park in question for public meetings and public talks.

"3. If the ordinance is construed and applied so as to justify convictions of the defendants under the facts in this case, then the ordinance is unconstitutional as construed and applied because it abridges the rights of the defendants to freedom of assembly, freedom of speech and freedom of worship, contrary to the Bill of Rights of the New Hampshire Constitution and the First and Fourteenth Amendments to the Constitution of the United States."

refusal of the licenses by the City Council was arbitrary and unreasonable, but refused to dismiss the prosecution on that ground because:

"The respondents could have raised the question of their right to licenses to speak in Goodwin Park by proper civil proceedings in this Court, but they chose to deliberately violate the ordinance."

On appeal, the Supreme Court of New Hampshire affirmed.[4] It held the ordinance valid on its face under *Cox* v. *New Hampshire,* 312 U. S. 569. While the *Cox* case involved the clause of the ordinance, § 22, relating to "parade or procession upon any public street or way," the New Hampshire Supreme Court thought the present prosecution was "under a valid ordinance which requires a license before open air public meetings may be held." This was the first ruling on the public speech clause. Cf. *State* v. *Cox,* 91 N. H., at 143, 16 A. 2d, at 513; *Cox* v. *New Hampshire,* 312 U. S., at 573. As the ordinance was valid on its face the state court determined the remedy was by certiorari to review the unlawful refusal of the Council to grant the license, not by holding public religious services in the park without a license, and then defending because the refusal of the license was arbitrary.

Appellant's challenge on federal grounds to the action and conclusion of the New Hampshire courts is difficult to epitomize. By paragraph 3 of his motion to dismiss, note 3, *supra,* appellant relied on the principles of the First Amendment for protection against the city ordinance. In his statement of jurisdiction, the question presented, No. I, the illegal denial of his application for a license, was urged as a denial of First Amendment principles.[5] In his

---

[4] *State* v. *Poulos,* 97 N. H. 352, 88 A. 2d 860.

[5] "Is the construction of the laws of New Hampshire and the ordinance in question—so as to completely deny the appellant the right to challenge the federal constitutionality of the ordinance, as enforced,

brief, he phrases the issue differently as indicated below.[6] We conclude that appellant's contentions are, first, no license for conducting religious ceremonies in Goodwin Park may be required because such a requirement would abridge the freedom of speech and religion guaranteed by the Fourteenth Amendment; second, even though a license may be required, the arbitrary refusal of such a license by the Council, resulting in delay, if appellant must, as New Hampshire decided, pursue judicial remedies, was unconstitutional, as an abridgment of free speech and a prohibition of the free exercise of religion. The abridgment would be because of delay through judicial proceedings to obtain the right of speech and to carry out religious exercises. The due process question raised

---

construed and applied in criminal proceedings brought to punish appellant for holding a meeting and giving a speech in the city park of Portsmouth without a permit, which was applied for and illegally denied according to the holdings of the courts below—an abridgment of the rights of appellant to freedom of speech and assembly contrary to the First and Fourteenth Amendments to the Constitution of the United States?"

[6] "Is the administration and enforcement of the ordinance by the City Council, requiring a permit for holding meetings in the parks of Portsmouth so as to deny all applications made by religious organizations to hold religious meetings and deliver religious talks in the parks of Portsmouth, an abridgment of freedom of speech, assembly and worship in violation of the First and Fourteenth Amendments to the United States Constitution?"

"Does the construction and application of the ordinance and the law of New Hampshire so as to require appellant to apply for a writ of mandamus or certiorari as the only remedies to correct the unconstitutional administration of the ordinance, and also so as to deny the defense in the criminal prosecution that the construction and application of the ordinance by the City Council was in violation of his rights guaranteed by the federal Constitution, amount to an abridgment of freedom of speech, assembly and worship contrary to the First and Fourteenth Amendments to the United States Constitution?"

by appellant as a part of the latter constitutional contention disappears by our holding, as indicated later in this opinion, that the challenged clause of the ordinance and New Hampshire's requirement for following a judicial remedy for the arbitrary refusal are valid. This analysis showing an attack on the ordinance as applied as repugnant to the principles of the First Amendment and a determination of its validity by the New Hampshire Supreme Court requires us to take jurisdiction by appeal.[7] The state ground for affirmance, i. e., the failure to take certiorari from the action refusing a license, depends upon the constitutionality of the ordinance.

*First.* We consider the constitutionality of the requirement that a license from the city must be obtained before conducting religious exercises in Goodwin Park. Our conclusion takes into consideration the interpretive limitation repeated from *State* v. *Cox,* quoted at p. 398 of this opinion. This state interpretation is as though written into the ordinance itself. *Winters* v. *New York,* 333 U. S. 507, 514. It requires uniform, nondiscriminatory and consistent administration of the granting of licenses for public meetings on public streets or ways or such a park as Goodwin Park, abutting thereon.[8] The two opinions of the Supreme Court of New Hampshire do not state in precise words that reasonable opportunities for public religious or other meetings on public property must be granted under this ordinance to such religious organizations as Jehovah's Witnesses. In the former appeal of this controversy in the *Derrickson* case, *supra,* New Hampshire decided that the city could exclude, without discrimination, all religious meetings from Goodwin Park,

---

[7] *King Mfg. Co.* v. *Augusta,* 277 U. S. 100; *Jamison* v. *Texas,* 318 U. S. 413. When the appeal was docketed we postponed determination of jurisdiction of the appeal to the hearing on the merits. 28 U. S. C. § 1257 (2); Rules of the Supreme Court, No. 12 (5).

[8] *State* v. *Derrickson,* 97 N. H. 91, 94, 81 A. 2d 312, 314.

if it so desired, leaving that one park, among several, there being no showing of its unique advantages for religious meetings, as a retreat for quietness, contemplation or other nonreligious activities. The Supreme Court refused to determine whether religious meetings could be excluded from all parks at all times. That has not been decided in this appeal. Informed witnesses at this trial without contradiction testified that no public religious services were ever licensed in any Portsmouth park. There was no allocation of parks between religious and nonreligious meetings. The Superior Court held the refusal of this license arbitrary and unreasonable. Obviously the license required is not the kind of prepublication license deemed a denial of liberty since the time of John Milton but a ministerial, police routine for adjusting the rights of citizens so that the opportunity for effective freedom of speech may be preserved.[9] While there was no assertion of the invalidity of the ordinance on its face, the Supreme Court determined the validity of the ordinance as applied. See *Dahnke-Walker Co.* v. *Bondurant,* 257 U. S. 282, 287; *Charleston Assn.* v. *Alderson,* 324 U. S. 182, 185–186.[10] We can only conclude from these decisions that the Supreme Court of New Hampshire has held that the ordinance is valid and, as now

---

[9] *Niemotko* v. *Maryland,* 340 U. S. 268, concurrence at 282: "A licensing standard which gives an official authority to censor the content of a speech differs *toto caelo* from one limited by its terms, or by nondiscriminatory practice, to considerations of public safety and the like."

[10] "It has been conceded by the defense on this transfer, as well as on the first one, that the ordinance is valid on its face. It is identical in language with the statute that was construed as valid in *State* v. *Cox,* 91 N. H. 137, which was affirmed in *Cox* v. *New Hampshire,* 312 U. S. 569. It is not disputed that the ordinance applies to the park that was the scene of the open air meetings in question. No objection has been made to the application of the ordinance to the areas where the meetings took place, and no exception taken

written, made it obligatory upon Portsmouth to grant a license for these religious services in Goodwin Park. The appellant's contention that the Council's application of the ordinance so as to bar all religious meetings in Goodwin Park without a license, made the ordinance unconstitutional, was not sustained by the Supreme Court of New Hampshire. Appellant's brief, p. 3, continues the claim in this Court as follows:

> "This exception presented to the Supreme Court of New Hampshire the question. It is whether the ordinance as enforced by the City Council, under its policy to refuse religious meetings in the park, was a violation of the federal Constitution."

By its construction of the ordinance the state left to the licensing officials no discretion as to granting permits, no power to discriminate, no control over speech. There is therefore no place for narrowly drawn regulatory require-

---

to any finding or ruling with respect thereto." 97 N. H. 352, 354, 88 A. 2d 860, 861.

"Again we call attention to the fact that in this jurisdiction if a licensing statute is constitutional and applies to those seeking a license, the remedy here provided consists of proceedings against the licensing authority that has wrongfully denied the license." 97 N. H., at 356, 88 A. 2d, at 862–863.

Distinguishing *Hague* v. *C. I. O.*, 307 U. S. 496, where a defense of unconstitutionality was allowed in a prosecution for holding a public meeting without a license, the State Court said: "Permits had been refused for public meetings, but, unlike the case at bar, the prosecutions were contemplated under ordinances that were invalid." 97 N. H., at 356–357, 88 A. 2d, at 863.

"The remedy of the defendant Poulos for any arbitrary and unreasonable conduct of the city council was accordingly in *certiorari* or other appropriate civil proceedings." 97 N. H., at 357, 88 A. 2d, at 863.

This conclusion follows the rule in *State* v. *Stevens*, 78 N. H. 268, 269–270, 99 A. 723, 724–725, that where a license statute is valid an erroneous refusal of the license cannot be attacked collaterally on prosecution for acting without a license.

ments or authority. The ordinance merely calls for the adjustment of the unrestrained exercise of religions with the reasonable comfort and convenience of the whole city. Had the refusal of the license not been in violation of the ordinance, the Supreme Court would not, we are sure, have required the appellant in its next application to go through the futile gesture of certiorari only to be told the Portsmouth Council's refusal of a license was a valid exercise of municipal discretion under the ordinance and the Fourteenth Amendment. Such state conclusions are not invalid, although they leave opportunity for arbitrary refusals that delay the exercise of rights.

The principles of the First Amendment are not to be treated as a promise that everyone with opinions or beliefs to express may gather around him at any public place and at any time a group for discussion or instruction. It is a *non sequitur* to say that First Amendment rights may not be regulated because they hold a preferred position in the hierarchy of the constitutional guarantees of the incidents of freedom. This Court has never so held and indeed has definitely indicated the contrary. It has indicated approval of reasonable nondiscriminatory regulation by governmental authority that preserves peace, order and tranquillity without deprivation of the First Amendment guarantees of free speech, press and the exercise of religion.[11] When considering specifically the regulation of

---

[11] Constitutionally protected right to circulate publications does not include door-to-door canvassing for subscriptions contrary to the reasonable limitations of a municipal ordinance. See *Breard* v. *Alexandria*, 341 U. S. 622, 641.

*Lovell* v. *Griffin*, 303 U. S. 444, 451:

"The ordinance is comprehensive with respect to the method of distribution. It covers every sort of circulation 'either by hand or otherwise.' There is thus no restriction in its application with respect to time or place. It is not limited to ways which might be regarded as inconsistent with the maintenance of public order or as involving disorderly conduct, the molestation of the inhabitants, or the misuse

the use of public parks, this Court has taken the same position.  See the quotation from the *Hague* case (below) and *Kunz* v. *New York,* 340 U. S. 290, 293–294; *Saia* v. *New York,* 334 U. S. 558, 562.  In these cases, the ordinances were held invalid, not because they regu-

---

or littering of the streets.  The ordinance prohibits the distribution of literature of any kind at any time, at any place, and in any manner without a permit from the City Manager."

In considering a required permit in *Hague* v. *C. I. O.,* 307 U. S. 496, Mr. Justice Roberts, in considering an ordinance that gave the Director of Public Safety discretion as to issue of park permits, p. 502, wrote:

"Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.  Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens.  The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied."  Pp. 515–516.

*Schneider* v. *State,* 308 U. S. 147, 160–161:

"Municipal authorities, as trustees for the public, have the duty to keep their communities' streets open and available for movement of people and property, the primary purpose to which the streets are dedicated.  So long as legislation to this end does not abridge the constitutional liberty of one rightfully upon the street to impart information through speech or the distribution of literature, it may lawfully regulate the conduct of those using the streets.  For example, a person could not exercise this liberty by taking his stand in the middle of a crowded street, contrary to traffic regulations, and maintain his position to the stoppage of all traffic; a group of distributors could not insist upon a constitutional right to form a cordon across the street and to allow no pedestrian to pass who did not accept a tendered leaflet; nor does the guarantee of freedom of speech or of the press deprive a municipality of power to enact regulations against throwing literature broadcast in the streets.  Prohibition of

lated the use of the parks for meeting and instruction but because they left complete discretion to refuse the use in the hands of officials. "The right to be heard is placed in the uncontrolled discretion of the Chief of Police." 334 U. S., at 560. "[W]e have consistently

such conduct would not abridge the constitutional liberty since such activity bears no necessary relationship to the freedom to speak, write, print or distribute information or opinion."

*Cantwell* v. *Connecticut*, 310 U. S. 296, 306–307:

"Even the exercise of religion may be at some slight inconvenience in order that the State may protect its citizens from injury. Without doubt a State may protect its citizens from fraudulent solicitation by requiring a stranger in the community, before permitting him publicly to solicit funds for any purpose, to establish his identity and his authority to act for the cause which he purports to represent. The State is likewise free to regulate the time and manner of solicitation generally, in the interest of public safety, peace, comfort or convenience. But to condition the solicitation of aid for the perpetuation of religious views or systems upon a license, the grant of which rests in the exercise of a determination by state authority as to what is a religious cause, is to lay a forbidden burden upon the exercise of liberty protected by the Constitution."

In considering conviction, for an unlicensed religious parade, under a statute with provisions similar to this ordinance, we said:

"Civil liberties, as guaranteed by the Constitution, imply the existence of an organized society maintaining public order without which liberty itself would be lost in the excesses of unrestrained abuses. The authority of a municipality to impose regulations in order to assure the safety and convenience of the people in the use of public highways has never been regarded as inconsistent with civil liberties but rather as one of the means of safeguarding the good order upon which they ultimately depend. The control of travel on the streets of cities is the most familiar illustration of this recognition of social need. Where a restriction of the use of highways in that relation is designed to promote the public convenience in the interest of all, it cannot be disregarded by the attempted exercise of some civil right which in other circumstances would be entitled to protection. One would not be justified in ignoring the familiar red traffic light because he thought it his religious duty to disobey the municipal command or sought by that means to direct public

condemned licensing systems which vest in an administrative official discretion to grant or withhold a permit upon broad criteria unrelated to proper regulation of public places." 340 U. S., at 294.

There is no basis for saying that freedom and order are not compatible. That would be a decision of desperation. Regulation and suppression are not the same,[12] either in purpose or result, and courts of justice can tell the difference. We must and do assume that with the determination of the Supreme Court of New Hampshire that the present ordinance entitles Jehovah's Witnesses to hold religious services in Goodwin Park at reasonable hours and times, the Portsmouth Council will promptly and fairly administer their responsibility in issuing permits on request.

*Second.* New Hampshire's determination that the ordinance is valid and that the Council could be compelled to issue the requested license on demand brings us face to face with another constitutional problem. May this man be convicted for holding a religious meeting without a license when the permit required by a valid enactment—the ordinance in this case—has been wrongfully refused by the municipality?

Appellant's contention is that since the Constitution guarantees the free exercise of religion, the Council's un-

---

attention to an announcement of his opinions." *Cox* v. *New Hampshire,* 312 U. S. 569, 574.

"If a municipality has authority to control the use of its public streets for parades or processions, as it undoubtedly has, it cannot be denied authority to give consideration, without unfair discrimination, to time, place and manner in relation to the other proper uses of the streets. We find it impossible to say that the limited authority conferred by the licensing provisions of the statute in question as thus construed by the state court contravened any constitutional right." *Id.,* at 576.

[12] *Near* v. *Minnesota,* 283 U. S. 697, 712; *Breard* v. *Alexandria,* 341 U. S. 622, 641; First Amendment.

lawful refusal to issue the license is a complete defense to this prosecution. His argument asserts that if he can be punished for violation of the valid ordinance because he exercised his right of free speech, after the wrongful refusal of the license, the protection of the Constitution is illusory. He objects that by the Council's refusal of a license, his right to preach may be postponed until a case, possibly after years, reaches this Court for final adjudication of constitutional rights. Poulos takes the position that he may risk speaking without a license and defeat prosecution by showing the license was arbitrarily withheld.

It must be admitted that judicial correction of arbitrary refusal by administrators to perform official duties under valid laws is exulcerating and costly. But to allow applicants to proceed without the required permits to run businesses, erect structures, purchase firearms, transport or store explosives or inflammatory products, hold public meetings without prior safety arrangements or take other unauthorized action is apt to cause breaches of the peace or create public dangers. The valid requirements of license are for the good of the applicants and the public. It would be unreal to say that such official failures to act in accordance with state law, redressable by state judicial procedures, are state acts violative of the Federal Constitution. Delay is unfortunate, but the expense and annoyance of litigation is a price citizens must pay for life in an orderly society where the rights of the First Amendment have a real and abiding meaning. Nor can we say that a state's requirement that redress must be sought through appropriate judicial procedure violates due process.[13]

---

[13] It may be that in some states, the proof of proper application and unlawful refusal is a sufficient defense. It is also true that others punish activities without a license, following an unlawful

It is said that *Royall* v. *Virginia,* 116 U. S. 572; *Cant-well* v. *Connecticut,* 310 U. S. 296, 306, and *Thomas* v. *Collins,* 323 U. S. 516, stand as decisions contrary to the New Hampshire judgment. In the *Royall* case two statutes were involved. One laid down the requirement that before attorneys could practice law in Virginia they had to obtain a special "revenue license." At the time this statute was enacted, Virginia law permitted license fees to be paid in either "tax due coupons" or money. Subsequently Virginia passed another statute with which the *Royall* case was concerned. It provided that license fees could only be paid in "lawful money of the United States." Royall tendered "tax due coupons" for the amount of the license fee, had them refused, and Royall then proceeded to practice law without the license.

---

refusal. *Commonwealth* v. *McCarthy,* 225 Mass. 192, 114 N. E. 287; *State* v. *Stevens,* 78 N. H. 268, 99 A. 723; *Phoenix Carpet Co.* v. *State,* 118 Ala. 143, 22 So. 627; *City of Montpelier* v. *Mills,* 171 Ind. 175, 85 N. E. 6; *Commonwealth* v. *Gardner,* 241 Mass. 86, 134 N. E. 638; *State* v. *Orr,* 68 Conn. 101, 35 A. 770; *City of Malden* v. *Flynn,* 318 Mass. 276, 61 N. E. 2d 107. A close parallel exists between unlawful refusals and failure to apply for license on the ground that such application would be unavailing. Such a defense is not allowed. "It is well settled that where a licensing ordinance, valid on its face, prohibits certain conduct unless the person has a license, one who without a license engages in that conduct can be criminally prosecuted without being allowed to show that the application for a license would have been unavailing. . . . In short, the individual is given the choice of securing a license, or staying out of the occupation, or, before he acts, seeking a review in the civil courts of the licensing authority's refusal to issue him a license. Likewise in the case at bar the defendants are given the choice of complying with the regulation, or not engaging in the regulated activity, or, before they act, petitioning the appropriate civil tribunals for a modification of or exception from the regulation." *United States* v. *Slobodkin,* 48 F. Supp. 913, 917. See cases cited, particularly *Hall* v. *Geiger-Jones Co.,* 242 U. S. 539, 554.

The statute requiring payment in money was held unconstitutional:

"Admitting this, it is still contended, on behalf of the Commonwealth, that it was unlawful for the plaintiff in error to practice his profession without a license, and that his remedy was against the officers to compel them to issue it. It is doubtless true, as a general rule, that where the officer, whose duty it is to issue a license, refuses to do so, and that duty is merely ministerial, and the applicant has complied with all the conditions that entitle him to it, the remedy by *mandamus* would be appropriate to compel the officer to issue it. That rule would apply to cases where the refusal of the officer was wilful and contrary to the statute under which he was commissioned to act. But here the case is different. The action of the officer is based on the authority of an act of the General Assembly of the State, which, although it may be null and void, because unconstitutional, as against the applicant, gives the color of official character to the conduct of the officer in his refusal; and, although at the election of the aggrieved party the officer might be subjected to the compulsory process of *mandamus* to compel the performance of an official duty, nevertheless the applicant, who has done everything on his part required by the law, cannot be regarded as violating the law if, without the formality of a license wrongfully withheld from him, he pursues the business of his calling, which is not unlawful in itself, and which, under the circumstances, he has a constitutional right to prosecute. As to the plaintiff in error, the act of the General Assembly of the State of Virginia forbidding payment of his license tax in its coupons, receivable for that tax by a contract protected by the

Constitution of the United States, is unconstitutional, and its unconstitutionality infects and nullifies the antecedent legislation of the State, of which it becomes a part, when applied, as in this case, to enforce an unconstitutional enactment against a party, not only without fault, but seeking merely to exercise a right secured to him by the Constitution. . . .

"In the present case the plaintiff in error has been prevented from obtaining a license to practice his profession in violation of his rights under the Constitution of the United States. To punish him for practicing it without a license thus withheld is equally a denial of his rights under the Constitution of the United States, and the law, under the authority of which this is attempted, must on that account and in his case be regarded as null and void." 116 U. S., at 582–583.

In *Cantwell* v. *Connecticut,* the statute in question forbade solicitation for religious causes without a license with this discretionary power in the secretary of the public welfare council:

"Upon application of any person in behalf of such cause, the secretary shall determine whether such cause is a religious one or is a bona fide object of charity or philanthropy and conforms to reasonable standards of efficiency and integrity, and, if he shall so find, shall approve the same and issue to the authority in charge a certificate to that effect." 310 U. S., at 302.

We said, speaking of the secretary:

"If he finds that the cause is not that of religion, to solicit for it becomes a crime. He is not to issue a certificate as a matter of course. His decision to issue or refuse it involves appraisal of facts, the exer-

cise of judgment, and the formation of an opinion. He is authorized to withhold his approval if he determines that the cause is not a religious one. Such a censorship of religion as the means of determining its right to survive is a denial of liberty protected by the First Amendment and included in the liberty which is within the protection of the Fourteenth." *Id.,* at 305.

In the *Thomas* case, a statute of Texas was involved that required labor union organizers to obtain an organizer's card before soliciting membership. § 5, 323 U. S., at 519, note 1. He was enjoined from soliciting membership without the card and violated the injunction. *Id.,* at 518. This Court concluded that Thomas was forbidden by the statute from making labor union speeches anywhere in Texas without a permit for solicitation of membership. *Id.,* at 532 *et seq.* The Court treated the statute as a prohibition of labor union discussion without an organizer's card anywhere within the bounds of Texas legislative power. It said:

"We think a requirement that one must register before he undertakes to make a public speech to enlist support for a lawful movement is quite incompatible with the requirements of the First Amendment." *Id.,* at 540.

The Court allowed the unconstitutionality of the statute to be used as a complete defense to contempt of the injunction.

It is clear to us that neither of these decisions is contrary to the determination of the Supreme Court of New Hampshire. In both of the above cases the challenged statutes were held unconstitutional. In the *Royall* case, the statute requiring payment of the license fee in money was unconstitutional. In the *Cantwell* case, the statute

had not been construed by the state court "to impose a mere ministerial duty on the secretary of the welfare council." The right to solicit depended on his decision as to a "religious cause." 310 U. S., at 306. Therefore we held that a statute authorizing this previous restraint was unconstitutional even though an error might be corrected after trial. In the *Thomas* case, the section of the Texas Act was held prohibitory of labor speeches anywhere on private or public property without registration. This made § 5 unconstitutional. The statutes were as though they did not exist. Therefore there were no offenses in violation of a valid law. In the present prosecution there was a valid ordinance, an unlawful refusal of a license, with remedial state procedure for the correction of the error. The state had authority to determine, in the public interest, the reasonable method for correction of the error, that is, by certiorari. Our Constitution does not require that we approve the violation of a reasonable requirement for a license to speak in public parks because an official error occurred in refusing a proper application.

*Affirmed.*

MR. JUSTICE FRANKFURTER, concurring in the result.

I am constrained to protest against the Court's discussion under *First* because it deals with an issue that is not here.

In no area of adjudication is the adage "silence is golden" more pertinent, when there is no duty to speak, than in the series of problems to which a judicial reconciliation between liberty and order gives rise. It is more than a counsel of wisdom. When there is no duty to speak on such issues there is a duty not to speak. This is not so merely because constitutional pronouncements, when a case before the Court does not call for them, vio-

late a constitutional practice sanctioned by history and reinforced by the costly experience of occasional departures from it. The practice is especially compelling in cases involving the scope and limits of judicial protection of religious freedom and freedom of speech. These present perhaps the most difficult issues for courts. By their very vastness, the themes to be translated into law lend themselves too readily to the innocent deceptions of rhetoric. Every new attempt to translate the legal content of these liberties impliedly brings into question prior attempts; at the least it encourages further efforts at exegesis.

The Court's opinion has carefully and, if I may say so, correctly defined the question to which it addresses itself in *First*. The Court finds that Poulos presents two contentions:

> "first, no license for conducting religious ceremonies in Goodwin Park may be required because such a requirement would abridge the freedom of speech and religion guaranteed by the Fourteenth Amendment; second, even though a license may be required, the arbitrary refusal of such a license by the Council, resulting in delay, if appellant must, as New Hampshire decided, pursue judicial remedies, was unconstitutional, as an abridgment of free speech and a prohibition of the free exercise of religion."

If lucid English means what it unambiguously says, the "first" contention in the above quotation—"no license for conducting religious ceremonies in Goodwin Park may be required because such a requirement would abridge the freedom of speech and religion guaranteed by the Fourteenth Amendment"—means that the Due Process Clause of the Fourteenth Amendment bars New Hampshire from requiring a license for "an open air public

meeting," as is required by the ordinance of Portsmouth.[1] And this in legal terms is a claim by the appellant that the ordinance (for jurisdictional purposes, a statute) is void on its face. Such precisely was the explicit claim made in *Cox* v. *New Hampshire,* 312 U. S. 569. In the *Cox* case the claim was that the scheme of licensing as such was out of constitutional bounds. It was to that issue that our unanimous decision was directed. From the beginning of the litigation that claim was explicitly rejected in the present case and at no subsequent stage of the litigation has Poulos claimed that the licensing scheme as such was void. No such claim is made in his statement as to jurisdiction, in his reply to the statement in opposition, or in his brief and reply brief on the merits. *Kai gar,* as the expressive Greek phrase ran—naturally so. Experienced counsel for Poulos tried to take himself from under the *Cox* decision and distinguished it from this case in that here "the respondents [the codefendant, Derrickson, died after the trial in the New Hampshire Superior Court] have attempted to comply with the ordinance and offered to pay the necessary fee and expenses." It is not that

---

[1] When the case was first before the New Hampshire Supreme Court on a stipulation of facts essentially different from the findings on which the decision in the present case must rest, there was in issue the claim that the city may not refuse a license for religious meetings in one park even "if there are still adequate places of assembly for those who wish to hold public open air church meetings." This question was taken out of the case upon remand for the trial which resulted in the conviction now before us. It was then found that the refusal to grant a license in this case was "arbitrary and unreasonable." In its second review of the case, in the only decision that is now here, the New Hampshire Supreme Court assumed that the Council's action was unlawful. Accordingly all that is subject to review now is the question whether the procedural law of New Hampshire, in relation to an illegally withheld license, may constitutionally operate in the circumstances of this case.

Poulos estopped himself, by applying for a license, from thereafter assailing the statute as void. It is that throughout he conceded the ordinance to be "valid on its face." *State* v. *Poulos,* 97 N. H. 352, 354, 88 A. 2d 860, 861.

The real constitutional attack that Poulos makes in the proceedings which are here under review, in all the briefs that are here filed, and in the oral argument, is founded on the fact that he was denied the opportunity to set up in a prosecution, under § 25 of the Portsmouth ordinance, for speaking without a license, the claim that in denying the license for which he applied the Portsmouth City Council acted arbitrarily and unreasonably. The only issue that arises from the proceedings had in the Portsmouth Municipal Court, which fined Poulos $20, in the Superior Court, which sustained the fine, and in the Supreme Court of New Hampshire, which affirmed the Superior Court, was whether the remedy for the concededly wrongful refusal to grant Poulos a license was mandamus to the City Council. These courts all agreed that he could not set up as a defense in the prosecution for speaking without a license the arbitrary conduct of the City Council in denying him one.

The matter was put with entire accuracy in the ruling of the Superior Court, which the Supreme Court found unexceptionable:

> "Counsel have tried these cases on the theory that the refusal of the City Council to grant licenses to the respondents was in issue. It is found as a fact that the action of the City Council in refusing to grant licenses to the respondents was arbitrary and unreasonable, but the Court rules as a matter of law that this issue is not properly before it in these proceedings." See *State* v. *Poulos, supra,* 97 N. H., at 353, 88 A. 2d, at 861.

The validity of this procedural requirement of New Hampshire—that the remedy for an unlawful denial of a license is mandamus or certiorari—is the only issue which the New Hampshire Supreme Court had before it:

"According to the [Superior] Court, the defendants misconceived their remedy. It has been conceded by the defense on this transfer [of the case from the Superior Court], as well as on the first one, that the ordinance is valid on its face. It is identical in language with the statute that was construed as valid in *State* v. *Cox,* 91 N. H. 137, which was affirmed in *Cox* v. *New Hampshire,* 312 U. S. 569. It is not disputed that the ordinance applies to the park that was the scene of the open air meetings in question. No objection has been made to the application of the ordinance to the areas where the meetings took place, and no exception taken to any finding or ruling with respect thereto." See *State* v. *Poulos, supra,* 97 N. H., at 354, 88 A. 2d, at 861.

Nowhere in any one of the four documents submitted to this Court on behalf of Poulos is there any showing that more than this procedural issue is before us. The grievance that is here is not that a license was required for speaking in Goodwin Park. The claim is that, having duly complied with this requirement by applying for a license that was then wrongfully refused, Poulos was free to speak without a license, and that he was not required to go to the Superior Court for a mandamus against the City Council.

In short, what is discussed under *First* in the Court's opinion would have been precisely appropriate had Poulos made the claim made in *Cox,* namely, that the congregation of Jehovah's Witnesses were not required to apply for a license, but is wholly without pertinence on the present record.

To be sure, Poulos makes the claim—having conceded that the statute is valid on its face—that the ordinance is unconstitutional "as applied" "under the facts in this case." But what "facts"? The facts are these: having complied with the statute requiring a license, he was not allowed to set up as a defense for its violation the fact that the want of a license was due to the illegal conduct of the licensing agency.

That is precisely what is correctly defined by the Court as the "second" contention:

> "second, even though a license may be required, the arbitrary refusal of such a license by the Council, resulting in delay, if appellant must, as New Hampshire decided, pursue judicial remedies, was unconstitutional, as an abridgment of free speech and a prohibition of the free exercise of religion."

But that is not the "second" contention. It is the only contention. It is the only contention that was before the New Hampshire Supreme Court in the proceeding we are reviewing, and it is the only contention, however variously phrased, on which Poulos can obtain review here.[2] And this is the contention—the statute "as applied" in this sense—that the Court treats in its discussion under *Second*.

On this, the only issue that is here, I agree that New Hampshire was not barred by the Due Process Clause from requiring Poulos to mandamus the City Council after it had unlawfully refused him a permit. New Hampshire may in these circumstances, I agree, refuse him permission to set up the Council's arbitrary denial of his application as a defense to prosecution under the ordinance, which fixes the penalty at $20. There is nothing in the record to suggest that the remedy to which

---

[2] See note 1, *supra*.

the Supreme Court of New Hampshire confined Poulos effectively frustrated his right of utterance, let alone that it circumvented his constitutional right by a procedural pretense. Poulos' application for a permit was denied on May 4, 1950, and the meetings for which he sought the permit were to be held on June 25 and July 2. In the absence of any showing that Poulos did not have available a prompt judicial remedy [3] to secure from the Council his right, judicially acknowledged and emphatically confirmed on behalf of the State at the bar of this Court, the requirement by New Hampshire that Poulos invoke relief by way of mandamus or certiorari and not take the law into his own hands did not here infringe the limitations which the Due Process Clause of the Fourteenth Amendment places upon New Hampshire. It would trivialize that Clause to bar New Hampshire from determining that legal issues raised by denial of a license, under a constitutionally valid system, should not be adjudicated in the first instance in police courts or, in any event, should be determined in an appropriately designed procedure and not as a defense to a penal action.

In reaching this conclusion the New Hampshire Supreme Court did not construe the ordinance; it did not, in the technical meaning of the phrase, apply the statute. "We see no reason," said that Court, "for overruling the law as stated in this jurisdiction that a wrongful refusal to license is not a bar to a prosecution for acting without a license." *State* v. *Poulos, supra,* 97 N. H., at 354, 88 A. 2d, at 861. What the Supreme Court of New Hampshire enforced was not a part of the licensing ordinance but the general procedural law of New Hampshire. It stretches the doctrine of *Dahnke-Walker Milling Co.* v. *Bondurant,* 257 U. S. 282, beyond reasonable limits to find that a re-

---

[3] See, *e. g., Nelson* v. *Morse,* 91 N. H. 177, 178, 16 A. 2d 61, 62.

quirement of New Hampshire procedure is an application of the licensing statute, rather than an application of the common law of New Hampshire. Therefore, I think, the case is properly here on certiorari and not appeal.

MR. JUSTICE BLACK, dissenting.

The Court's holding in this case is one more in a series of recent decisions which fail to protect the right of Americans to speak freely. I join MR. JUSTICE DOUGLAS' forceful dissent and wish to add only a few words.

I agree with the Court that the validity of the speech licensing phase of this New Hampshire law was not upheld in *Cox* v. *New Hampshire,* 312 U. S. 569. That case merely recognized that the power of a state to regulate streets for traffic purposes carried with it a right to regulate street parades.[1] Nothing said there indicated that a state's power to regulate traffic carried with it a right to censor public speeches or speakers merely because the state did not wish certain speakers to be heard. Here the record shows beyond doubt that objection to Poulos' talking was not rooted in a permissible regulation as to the time and place street or park speeches could be made. For the New Hampshire Supreme Court tells us that its officials "arbitrarily and unreasonably" refused to grant Poulos a "license" to talk. This shows that the state's speech licensing officials actually denied Poulos his con-

---

[1] "They [appellants] were not prosecuted for distributing leaflets, or for conveying information by placards or otherwise, or for issuing invitations to a public meeting, or for holding a public meeting, or for maintaining or expressing religious beliefs. Their right to do any one of these things apart from engaging in a 'parade or procession' upon a public street is not here involved and the question of the validity of a statute addressed to any other sort of conduct than that complained of is not before us." *Cox* v. *New Hampshire,* 312 U. S. 569, 573.

stitutional right of free speech.[2]  The Court now holds Poulos can be branded a criminal for making a talk at the very time and place which the State Supreme Court has held its licensing officials could not legally forbid.  I do not challenge the Court's argument that New Hampshire could prosecute a man who refused to follow the letter of the law to procure a license to "run businesses," "erect structures," "purchase firearms," "store explosives," or, I may add, to run a pawnshop.  But the First Amendment affords freedom of speech a special protection; I believe it prohibits a state from convicting a man of crime whose only offense is that he makes an orderly religious appeal after he has been illegally, "arbitrarily and unreasonably" denied a "license" to talk.  This to me is a subtle use of a creeping censorship loose in the land.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK concurs, dissenting.

The Court concedes, as indeed it must under our decisions (see *Royall* v. *Virginia,* 116 U. S. 572; *Thomas* v. *Collins,* 323 U. S. 516), that if denial of the right to speak had been contained in a statute, appellant would have been entitled to flout the law, to exercise his constitutional right to free speech, to make the address on July 2, 1950, and when arrested and tried for violating the statute, to defend on the ground that the law was unconstitutional.  An unconstitutional statute is not necessarily a nullity; it may have intermediate consequences binding upon people.  See *Chicot County Dist.* v. *Bank,*

---

[2] In the Superior Court Poulos took the position that the city council's refusal to "license" him to speak was "arbitrary and unreasonable" and in violation of the right freely to assemble, speak and worship guaranteed by the First and Fourteenth Amendments. The State Supreme Court affirmed the Superior Court's holding that the council's refusal was arbitrary and unreasonable.

308 U. S. 371. But when a legislature undertakes to proscribe the exercise of a citizen's constitutional right to free speech, it acts lawlessly; and the citizen can take matters in his own hands and proceed on the basis that such a law is no law at all. See *De Jonge* v. *Oregon,* 299 U. S. 353, 365.

The reason is the preferred position granted freedom of speech, freedom of press, freedom of assembly, and freedom of religion by the First Amendment. See *Thomas* v. *Collins, supra,* p. 530; *Murdock* v. *Pennsylvania,* 319 U. S. 105, 115. The command of the First Amendment (made applicable to the States by the Fourteenth) is that there shall be *no* law which abridges those civil rights. The matter is beyond the power of the legislature to regulate, control, or condition. The case is therefore quite different from a legislative program in the field of business, labor, housing, and the like where regulation is permissible and the claim of unconstitutionality usually can be determined only by the manner or degree of application of the statute to an aggrieved person.

A legislature that undertakes to license or censor the right of free speech is imposing a prior restraint (see *Near* v. *Minnesota,* 283 U. S. 697), odious in our history. The Constitution commands that government keep its hands off the exercise of First Amendment rights. No matter what the legislature may say, a man has the right to make his speech, print his handbill, compose his newspaper, and deliver his sermon without asking anyone's permission. The contrary suggestion is abhorrent to our traditions.

If the citizen can flout the legislature when it undertakes to tamper with his First Amendment rights, I fail to see why he may not flout the official or agency who administers a licensing law designed to regulate the exercise of the right of free speech. Defiance of a statute

is hardly less harmful to an orderly society than defiance of an administrative order. The vice of a statute, which exacts a license for the right to make a speech, is that it adds a burden to the right. The burden is the same when the officials administering the licensing system withhold the license and require the applicant to spend months or years in the courts in order to win a right which the Constitution says no government shall deny.

It was said by way of dictum in *Royall* v. *Virginia, supra,* p. 582, that "as a general rule," if an officer, entrusted with a licensing power, has only "ministerial" duties to perform, "the remedy by *mandamus* would be appropriate to compel the officer" to issue the license. I do not agree that the present statute, as construed by the New Hampshire court, imposes merely a ministerial duty on the city council. The construction, by which we are bound, gives wide range to the discretion of the city council:

> "The discretion thus vested in the authority is limited in its exercise by the bounds of reason, in uniformity of method of treatment upon the facts of each application, free from improper or inappropriate considerations and from unfair discrimination. A systematic, consistent and just order of treatment, with reference to the convenience of public use of the highways [here the parks], is the statutory mandate. The licensing authority has no delegation of power in excess of that which the legislature granting the power has and the legislature attempted to delegate no power it did not possess." *State* v. *Cox,* 91 N. H. 137, 143, 16 A. 2d 508, 513.

The requirement that the licensing authority stay within "the bounds of reason" and that it be "free from improper or inappropriate considerations and from unfair discrimination" is a command that it act reasonably, not

capriciously or arbitrarily. But even a reasonable regulation of the right to free speech is not compatible with the First Amendment.[1] Of course, a state could deny the use of a park to one religious group if a prior application had been granted to another group and the meetings would conflict. But there is no suggestion by New Hampshire that its system of regulation vests the licensing authority with only that limited power. The gloss which the New Hampshire court has placed on the statute grants a power reasonably to regulate free speech. That unfortunately is a doctrine that has been slowly creeping into our constitutional law.[2] It has no place there. It is a doctrine dangerous to liberty and destructive of the great rights guaranteed by the First Amendment.

So, one answer to the Court's holding that appellant should have gone into court to compel the issuance of a license is that the licensing power was discretionary not

---

[1] This marks a distinction between the present case and *Cox* v. *New Hampshire*, 312 U. S. 569. There the sole charge against appellants was that they were "taking part in a parade or procession" on public streets without a license. We only held that New Hampshire's method of controlling travel on the streets of cities was permissible under the police power of the states. We distinguished that problem from like cases arising under the First Amendment, p. 573,

"The sole charge against appellants was that they were 'taking part in a parade or procession' on public streets without a permit as the statute required. They were not prosecuted for distributing leaflets, or for conveying information by placards or otherwise, or for issuing invitations to a public meeting, or for holding a public meeting, or for maintaining or expressing religious beliefs. Their right to do any one of these things apart from engaging in a 'parade or procession' upon a public street is not here involved and the question of the validity of a statute addressed to any other sort of conduct than that complained of is not before us."

[2] *Beauharnais* v. *Illinois*, 343 U. S. 250; *Dennis* v. *United States*, 341 U. S. 494; *Feiner* v. *New York*, 340 U. S. 315. Cf. *Breard* v. *Alexandria*, 341 U. S. 622; *American Communications Assn.* v. *Douds*, 339 U. S. 382; *Osman* v. *Douds*, 339 U. S. 846.

ministerial and that a discretionary power to license free speech is unconstitutional.

There is another answer which is found in *Cantwell* v. *Connecticut,* 310 U. S. 296. In that case it was argued that a licensing power in a state statute be construed so as to limit the power of the licensing authority to ministerial acts. We rejected that offer on two grounds. In the first place, the statute had not been so narrowly construed by the state court. In the second place, the availability of judicial relief would not *in any event* save the statute. What Mr. Justice Roberts, writing for a unanimous Court, said was this (310 U. S., at 306):

> ". . . the availability of a judicial remedy for abuses in the system of licensing still leaves that system one of previous restraint which, in the field of free speech and press, we have held inadmissible. A statute authorizing previous restraint upon the exercise of the guaranteed freedom by judicial decision after trial is as obnoxious to the Constitution as one providing for like restraint by administrative action."

What Mr. Justice Roberts said needs to be repeated over and again. There is no free speech in the sense of the Constitution when permission must be obtained from an official before a speech can be made. That is a previous restraint condemned by history and at war with the First Amendment. The nature of the particular official who has the power to grant or deny the authority does not matter. Those who wrote the First Amendment conceived of the right to free speech as wholly independent of the prior restraint of anyone. The judiciary was not granted a privilege of restraint withheld from other officials. For history proved that judges too were sometimes tyrants.