**STATE of Maine**

v.

**Hardy F. HIGGINS.**

Supreme Judicial Court of Maine.

May 8, 1975.

Peter G. Ballou, Asst. Dist. Atty., Portland, Thomas L. Goodwin, Law Student, for plaintiff.

J. Armand Gendron, Sanford, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, ARCHIBALD and DELAHANTY, JJ.

WERNICK, Justice.

A Justice of the Superior Court (Cumberland County) has reported to us for decision on an agreed statement of facts [1] an important question of law raised by the motion of defendant, Hardy F. Higgins, to dismiss a complaint charging him with a violation of 29 M.R.S.A. § 2184 in that he operated a motor vehicle

"while his right or license to operate . . . in the State of Maine was then and there under suspension . . . ." [2]

On March 29, 1972 defendant was arrested by a State Police officer for operating a motor vehicle while under the influence of intoxicating liquor. In accordance with 29 M.R.S.A. § 1312 (hereinafter des-

1. Rule 37A(a) M.R.Crim.P. authorizes this procedure.

2. The Justice of the Superior Court reported the case on February 7, 1974. The case was brought before this Court for oral argument at its October, 1974 Term.

ignated the "implied consent" statute) [3] the officer requested defendant to submit to "a chemical test to determine his blood-alcohol level by analysis of his blood or breath."

Defendant refused, and no test was given. When the Secretary of State received a "written statement under oath" notifying him of defendant's refusal "to submit to a chemical test to determine . . . blood-alcohol level . . .", the Secretary, pursuant to the implied consent statute, "immediately", without affording defendant prior notice and hearing, suspended for three months defendant's license to operate a motor vehicle.

Notice of the suspension was given to defendant by registered mail. Thereafter, defendant did not seek an after-the-fact hearing before the Secretary concerning whether defendant had been

"lawfully placed under arrest and . . . refused to submit to one of the tests upon the request of a law enforcement officer."

Defendant also omitted to pursue his right to a Superior Court review of the propriety of the suspension.

On September 6, 1972, before expiration of the three months period of license suspension, defendant was arrested on the charge now sought to be dismissed, that defendant was operating a motor vehicle while his license to operate was under suspension.

Defendant argues for dismissal on the theory that the implied consent statute vio-

3. The relevant provisions of the statute are: "Any person who operates or attempts to operate a motor vehicle within this State shall be deemed to have given consent to a chemical test to determine his blood-alcohol level by analysis of his blood or breath, if arrested for operating or attempting to operate a motor vehicle while under the influence of intoxicating liquor.

\*   \*   \*   \*   \*

"1. *Prerequisites to tests.* Before any test specified is given, the law enforcement officer shall inform the arrested person of the consequences of his refusal to permit a test at the direction of the law enforcement officer. If the law enforcement officer fails to comply with this prerequisite, any test results shall be inadmissible as evidence in any proceeding before any administrative officer or court of this State.

"2. *Hearing.* If a person under arrest refuses upon the request of a law enforcement officer to submit to a chemical test to determine his blood-alcohol level by analysis of his blood or breath, none shall be given. The Secretary of State, upon the receipt of a written statement under oath of the arrest of a person for operating or attempting to operate a motor vehicle while under the influence of intoxicating liquor, and that such person had refused to submit to a chemical test to determine his blood-alcohol level by analysis of his blood or breath, shall immediately notify the person, in writing, as provided in section 2241 that his license or permit and his privilege to operate have been suspended. Such suspension shall be for a period of 3 months for a first refusal under this or any prior implied consent provision under Maine law.

"If such refusal is a 2nd or subsequent refusal under this or any prior implied consent provision under Maine law, such suspension shall be for a period of 6 months.

"If such person desires to have a hearing, he shall notify the Secretary of State within 10 days, in writing, of such desire. Any suspension shall remain in effect pending the outcome of such hearing, if requested.

"The scope of such a hearing shall cover whether the individual was lawfully placed under arrest and whether he refused to submit to one of the tests upon the request of a law enforcement officer. If it is determined, after hearing when such is requested, that such person was not arrested or did not refuse to permit a chemical test to determine his blood-alcohol level by analysis of his blood or breath, any suspension in effect shall be removed immediately.

"3. *Review.* Any person, whose license, permit or privilege to operate is suspended for refusal to submit to a chemical test to determine his blood-alcohol level by analysis of his blood or breath at the direction of a law enforcement officer after having been arrested for operating or attempting to operate while under the influence of intoxicating liquor, shall have the right to file a petition in the Superior Court in the county where he resides, or in Kennebec County, to review the order of suspension by the Secretary of State by the same procedure as is provided in section 2242."

lates the "procedural due process" requirements of the Fourteenth Amendment to the Constitution of the United States insofar as it requires suspension of a license to operate a motor vehicle "immediately" and thus precludes a prior notice and hearing. Accordingly, says defendant, in the present situation the purported suspension of his license was a nullity from the moment it was imposed, with the result that on September 6, 1972 defendant, in legal contemplation, was operating a motor vehicle as the possessor of a license legally in force.

Without need to decide the "procedural due process" constitutional issue raised by defendant, we hold defendant's position erroneous and conclude that his motion to dismiss the complaint must be denied.

Defendant's argument is predicated on the assumption that defendant is entitled to assert the unconstitutionality of the license suspension provisions of the implied consent statute by the particular kind of collateral attack here levelled—an attack in which defendant, without achieving a prior judicial determination of the law and relying on his own judgment that the license-suspension provisions of the implied consent statute are unconstitutional, (1) has engaged in conduct which is independently criminal and (2) in the prosecution for the independent crime has purported to avoid conviction by levelling a collateral attack against the constitutionality of the prior action of the Secretary of State as taken in a separate proceeding.

We are satisfied that public policy considerations directed to the preservation and strengthening of

> "the civilizing hand of law, which alone can give abiding meaning to constitutional freedom",

see: Walker v. Birmingham, 388 U.S. 307, 321, 87 S.Ct. 1824, 1832, 18 L.Ed.2d 1210 (1967), demand rejection of this foundational premise of defendant's argument.

In our system of government the judiciary has power and responsibility to declare unconstitutional, and thus without legal effectiveness, a statute and governmental action pursuant to the statute. For this reason, the enactment of a statute does not guarantee its force as law, and it frequently happens that after a statute has been duly enacted and governmental action has been undertaken pursuant to it (as if it be law), a judicial determination of the statute's unconstitutionality supervenes.

In such instances questions as to the legal effectiveness to be attributed to the statute, and the governmental action under it,—as facts in existence prior to the judicial determination of unconstitutionality—are, as stated in Chicot County Drainage District v. Baxter State Bank et al, 308 U.S. 371, 60 S.Ct. 317, 84 L.Ed. 329 (1940),

> "... among the most difficult of those which have engaged the attention of courts, state and federal, ...." (p. 374, 60 S.Ct. p. 319)

At an earlier time answers to these questions were formulated, generally, in terms of a principle stated in Norton v. Shelby County, 118 U.S. 425, 6 S.Ct. 1121, 30 L. Ed. 178 (1886), that

> "[a]n unconstitutional act ... is, in legal contemplation, as inoperative as though it had never been passed." (p. 442, 6 S.Ct. p. 1125)

A corollary deriving from this principle of "utter nullity ab initio" was the doctrine that the issue of the unconstitutionality of a statute, and of governmental action under it, is properly open for judicial determination even when raised in a collateral attack. The rationale was that since, under Norton v. Shelby County, a judicial determination of unconstitutionality nullifies the legal force of the statute from its inception, the opportunity for a definitive judicial determination of unconstitutionality must always be available, whether directly or collaterally, to prevent the factual persistence of the statute as a legal cloud.

At least as early as 1940 a trend away from the absolute "ab initio nullity" doctrine of Norton v. Shelby was discernible. In Chicot County Drainage District v. Baxter State Bank, supra, the Supreme Court of the United States observed:

". . . it is manifest . . . that an all-inclusive statement of a principle of absolute retroactive invalidity cannot be justified." (308 U.S. p. 374, 60 S.Ct. p. 319)

"The actual existence of a statute, prior to . . . a determination [of its unconstitutionality], is an operative fact and may have consequences which cannot justly be ignored." (p. 374, 60 S.Ct. p. 318)

Thirty-three years after *Chicot County,* supra, the Court, in Lemon v. Kurtzman (II), 411 U.S. 192, 93 S.Ct. 1463, 36 L.Ed. 2d 151 (1973), extensively reviewed the incursions upon, and qualifications of, the "absolute ab initio nullity" approach of Norton v. Shelby and laid it to rest, saying:

"However appealing the logic of *Norton* may have been in the abstract, its abandonment reflected our recognition that statutory or even judge-made rules of law are hard facts on which people must rely in making decisions and in shaping their conduct. This fact of legal life underpins our modern decisions recognizing a doctrine of nonretroactivity." (p. 199, 93 S.Ct. p. 1468)

The Court then distilled the essence of the modern view into the principle that courts will

"eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests, *notwithstanding that those interests have constitutional roots.*" (p. 201, 93 S.Ct. p. 1469) (emphasis supplied)

Insofar as the Norton v. Shelby "ab initio nullity" doctrine has been abandoned in favor of an approach looking to the

"practical realities . . . inescapably involved in reconciling competing interests",

the "collateral attack" principle deriving as a corollary from Norton v. Shelby County must be re-evaluated within the Lemon v. Kurtzman (II) criteria.

Initially, we observe that particular limitations upon collateral attack as a method of raising constitutional issues are already well recognized. These limitations reflect a public policy judgment that "respect for law" is a value of our society of the highest priority and must be held to overbalance a citizen's interest to vindicate rights, even if constitutionally rooted, by a collateral attack initiated by the citizen's resort to "self-help" conduct having independent criminal consequences.

Thus, more than half a century ago in Howat v. Kansas, 258 U.S. 181, 42 S.Ct. 277, 66 L.Ed. 550 (1922), relative to a charge of criminal contempt resulting from the violation of an injunction order, the Supreme Court of the United States held:

"An injunction duly issuing out of a court of general jurisdiction with equity powers upon pleadings properly invoking its action, and served upon persons made parties therein and within the jurisdiction, must be obeyed by them *however erroneous the action of the court may be, even if the error be in the assumption of the validity of a seeming but void law going to the merits of the case.* It is for the court of first instance to determine the question of the validity of the law, and until its decision is reversed for error by orderly review, either by itself or by a higher court, its orders based on its decision are to be respected, and disobedience of them is contempt of its lawful authority, to be punished." (pp. 189, 190, 42 S.Ct. p. 280) (emphasis supplied)

In Walker v. Birmingham, 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967) the Court focused more sharply on the policy considerations underlying Howat v. Kansas, supra, as follows:

" . . . in the fair administration of justice no man can be judge in his own case, however exalted his station, however righteous his motives, and irrespective of his race, color, politics, or religion. This Court cannot hold . . . petitioners . . . constitutionally free to ignore all the procedures of the law and carry their battle to the streets. . . . respect for judicial process is a small price to pay for the civilizing hand of law, which alone can give abiding meaning to constitutional freedom." (pp. 320, 321, 87 S.Ct. p. 1832)

See also: United States v. United Mine Workers, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947).

Specifically as to the crime of "escape", it has long been settled that, notwithstanding that the "lawfulness of detention" is one essential element of the crime of "escape", a defendant is denied right to avoid guilt of "escape" by asserting as a collateral matter in the prosecution for "escape" the existence of deficiencies in the prior proceedings giving rise to the "detention." The principle governs even as to constitutional infirmities which cause the original proceedings to be "void." Beaulieu v. State, 161 Me. 248, 211 A.2d 290 (1965). As was pointedly clarified in *Beaulieu,* although the deprivation of constitutional rights involved in the original "larceny" conviction was of the kind that the

" . . . Court [in the larceny case] . . . loses jurisdiction of the cause" (p. 253, 211 A.2d p. 293),

the issue was foreclosed to defendant when raised as an incident of a

" . . . collateral attack upon the larceny conviction at the escape trial, . . . ." (p. 254, 211 A.2d p. 293)

Also: Chapman v. State, Me., 250 A.2d 696 (1969).

In Fuller v. State, Me., 282 A.2d 848 (1971) this Court gave the *Beaulieu* doctrine more generalized scope.

Detained at the Men's Correctional Center, Fuller had resorted to a "self-help" attack on the validity of his detention by assaulting a guard who was attempting to exert supervisory control of his person. In the prosecution for assault and battery upon the guard, Fuller claimed innocence on the theory that the guard lacked legal authority to control Fuller's person because Fuller's commitment to the Men's Correctional Center was an utter nullity as arising from a proceeding itself "void" for violation of the constitutional requirements of In Re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1966).

In holding that Fuller was foreclosed from this type of collateral attack, this Court made explicitly clear that

" . . . regardless of whether constitutional requirements of In Re Gault had been violated when petitioner was found to be a juvenile offender and was committed to the Men's Correctional Center, his confinement . . . had been continuing *as a lawful operative fact."* (282 A.2d p. 850)

On this basis, this Court concluded that the method of collateral attack open to Fuller was to achieve a judicial determination of the unconstitutionality of his confinement by resorting to the kind of "legal process" not requiring as a prerequisite that he take the law into his own hands by committing an independent crime.

We are aware that the above-discussed "self-help" situations involve other public policy concerns than that of promoting "the rule of law" through insistence that collateral attacks be undertaken by initial resort to the courts rather than "self-help" conduct constituting an independent crime. When the "self-help" defiance of a Court

order is charged as a criminal contempt, and it is the order of a Court of general jurisdiction which is violated, there is the further special factor that such Court has lawful jurisdiction initially to adjudicate for itself the scope of its power and authority. See: United States v. Shipp, 203 U.S. 563, 573, 27 S.Ct. 165, 51 L.Ed. 319 (1906); Howat v. Kansas, supra, 258 U.S. at p. 190, 42 S.Ct. 277. In the context of "escape" from, or "assaults" upon guards in, prisons or other institutions of detention it is necessary to the fulfillment of the special purposes for which the detention institutions exist that there be extraordinary measures to ensure the maintenance of discipline and order.

Yet, regardless of the relative strengths of the plural policy interests applicable in the foregoing contexts, commonly operative in all of them, and of undeniably high priority as indispensable to the enduring vitality of a free society, is the public interest to foster a "reign of law" and avoid the "chaos" and the anarchy ultimately invited,

> "[i]f one man can be allowed to determine for himself what is law",

since, then, "every man can." See: Frankfurter, J., concurring in United States v. United Mine Workers, supra, 330 U.S. at pp. 308, 312, 67 S.Ct. 677.

The overriding importance of this public policy consideration per se appears in this Court's decision in State v. Nagle, 148 Me. 197, 91 A.2d 397 (1952). We there held that even though an administrative tribunal may have acted erroneously in withholding from the defendant a license authorizing him to engage in a particular activity, defendant was without right to assert the error collaterally to avoid his guilt of the charge of criminality arising from defendant's having engaged in the activity without the requisite license. This Court said in Nagle:

> "The applicant is not permitted to take the law into his own hands and engage

in the action for which the permit or license is required." (p. 203, 91 A.2d p. 400)

Concededly, in Nagle the erroneous governmental action which defendant sought to attack collaterally, as incident to his effort to deny the independent criminality of his "self-help" conduct, was not of constitutional dimension. By the modern approach, however, as brought most sharply into focus in Lemon v. Kurtzman (II), supra, this distinction is no longer determinative. By the Lemon v. Kurtzman (II) criteria

> "notwithstanding that those interests [collaterally asserted by defendant] have constitutional roots" (411 U.S. p. 201, 93 S.Ct. p. 1469)

the Court is to achieve a "reconciling [of] competing interests" by

> "look[ing] to the practical realities . . . inescapably involved." (p. 201, 93 S.Ct. p. 1469)

In the case at bar the public interest competing against defendant's interest to vindicate a claimed constitutional right is the avoidance of the proliferation of crimnality and the potential for anarchy which inheres in allowing citizens to engage in "self-help" conduct constituting an independent crime as the initial step of a collateral attack upon the constitutionality of a statute and of governmental action taken pursuant to such statute. With the contest in this posture our view is that the "practical realities" of the public interest are sufficiently weighty to overbalance the defendant's interest to achieve, by a collateral attack, the vindication of his constitutional rights—at least when, as here, the constitutional rights asserted are not of the type protected by the First Amendment to the Constitution of the United States (or counterpart provisions of the Constitution of Maine). Cf. Poulos v. New Hampshire, 345 U.S. 395, 73 S.Ct. 760, 97 L.Ed. 1105 (1953).

We decide therefore, that defendant lacks right to raise the instant constitutional issue, which does not involve constitutional rights protected under the federal First Amendment (or counterpart provisions of the Constitution of Maine), by the type of attack here levelled:—an attack in which defendant has engaged in "self-help" conduct independently criminal and his guilt of which defendant seeks to avoid by asserting, collaterally, in the criminal proceedings against him the unconstitutionality of governmental action taken in a separate proceeding and which defendant failed to attack directly through available administrative and judicial processes.[4]

Since the constitutional issue thus foreclosed to defendant is the only issue which defendant's motion to dismiss the complaint purports to raise, the motion to dismiss must be denied.

The entry is:

The motion of defendant to dismiss the complaint is denied.

Case remanded to the Superior Court for entry of an appropriate order denying defendant's motion to dismiss the complaint.

All Justices concurring.

4. We emphasize that our decision in the case at bar is confined to *collateral attack* and carries no implications as to conduct violative of a criminal statute which is undertaken as the first step of a *direct* judicial attack on the constitutionality of the statute. In such *"direct attack"* context violation of the criminal statute may be necessary to create the "actual case or controversy" requisite for the valid exercise of judicial power.

We also stress that we do not here address the question whether, under the Lemon v. Kurtzman (II) criteria, the failure of the defendant to invoke the processes available to him to achieve a direct judicial determination of the constitutional questions raised produces a "waiver" which bars defendant from asserting the issues in a collateral attack not involving an initial resort to "self-help" criminal conduct. Thus, by way of illustration, we here intimate no opinion on whether defendant's failure to seek Superior Court review of his license suspension, as provided by the implied consent law, would foreclose defendant from achieving in a declaratory judgment proceeding, initiated while the suspension period was still running, a collateral adjudication of the unconstitutionality of the license suspension and an order vacating it.