

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-16-2007

# USA v. Laville

Precedential or Non-Precedential: Precedential

Docket No. 06-1577

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"USA v. Laville" (2007). *2007 Decisions.* Paper 1383.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1383

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 06-1577

UNITED STATES OF AMERICA,
                                            Appellant

v.

KEVIN LAVILLE

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF THE VIRGIN ISLANDS
D.C. Crim. No. 04-cr-00142-1
District Judge:  The Honorable Curtis V. Gomez

Argued:  December 4, 2006

Before: McKEE, BARRY and STAPLETON, <u>Circuit Judges</u>

(Opinion Filed: March 16, 2007)

John-Alex Romano, Esq. (Argued)
United States Department of Justice
Criminal Division
P.O. Box 899
Ben Franklin Station
Washington, D.C.  20044-0899
        -AND-

Angela P. Tyson-Floyd, Esq.
Office of the United States Attorney
1108 King Street, Suite 201
Christiansted, St. Croix
USVI, 00820

Counsel for Appellant


Natalie N. Tang How, Esq. (Argued)
27 & 28 King Cross Street
Christiansted, St. Croix
USVI, 00820

Counsel for Appellee

———

OPINION OF THE COURT

———


BARRY, Circuit Judge

What is required for a finding of probable cause within the meaning of the Fourth Amendment can be a difficult question, made more difficult when, as here, there is a misunderstanding as to what one of our decisions has held. We write to correct that misunderstanding by making clear that state or local law does not dictate the reasonableness of an arrest for purposes of a Fourth Amendment probable cause analysis—a violation of state or local law is not, in other words, a *per se* violation of the Fourth Amendment. Rather, notwithstanding the validity of the arrest under state or local law, probable cause exists when the totality of the circumstances within an officer's knowledge is sufficient to warrant a person of reasonable caution to conclude that the person being arrested has committed or is committing an offense. We find that the circumstances surrounding the warrantless arrest before us gave rise to probable cause to believe that an offense had been committed

and rendered that arrest reasonable under the Fourth Amendment. We will, therefore, reverse.

## I.

In the early morning hours of Tuesday, August 17, 2004, sometime before 7:00 A.M., a boat carrying 32 illegal aliens ran aground on a reef in Christiansted harbor, St. Croix. An eyewitness on the wharf phoned the Virgin Islands Police Department ("VIPD") to report that illegal aliens were exiting the boat and coming ashore.

Officer Aldemar Santos of the VIPD Marine Unit responded to the call between 7 and 8:00 A.M. From the wharf, he confirmed that a boat had indeed run aground in the harbor and that a number of people were still onboard. He also spoke with the citizen who had phoned the police, Mark Sperber, and Sperber pointed out four Hispanic-looking individuals sitting nearby on the boardwalk. Santos approached them and identified himself as a police officer. In response to his questioning, the individuals stated that they were Cubans, that they had come off the stranded boat, and that other aliens were in the vicinity.

Sperber independently advised Santos that other illegal aliens had come ashore and were around the corner. As additional police units arrived, Sperber offered to identify the other aliens. Santos, Sperber, and several uniformed officers walked down the boardwalk and around the corner, and Sperber pointed out three black males sitting on a bench. When the men saw the approaching officers, Santos later testified, "they stood up and started walking away really fast." (App. vol. II at 39.)

Hoping to cut the men off, Santos walked down a side street while the other officers continued to follow the three men. On his radio, he heard an officer shout "he's running" and another officer say that one of the men was heading toward a shopping area on Strand Street. Santos proceeded in the direction of the shopping area, where he saw appellant Kevin Laville, who he recognized as one of the men who had been

sitting on the bench. Upon spotting Santos, Laville began to run, but stopped when Santos yelled "Police; stop." Santos ordered Laville to put his hands up, patted him down, and placed him in handcuffs.

As they walked back to the police car, Laville stated, in response to Santos's questions, that he was from Dominica and was a crew member on the stranded boat. Laville asked what island he was on, but Santos believed that Laville knew he was on St. Croix. Meanwhile, the other officers apprehended all of the individuals who had come ashore. Later that morning, agents from Immigration and Customs Enforcement ("ICE") came to the police station and took custody of all of the detained individuals, including Laville.

The next day, utilizing a photo array of all 32 individuals who had been on the boat, four of the Cuban passengers identified Laville and co-defendant Carter Magloire as the boat's operators. That same day, ICE Agent David Levering and Officer Santos conducted a videotaped interview of Laville. After being advised of his *Miranda* rights, he again stated that he was from Dominica and had helped to operate the boat. He also said that he believed he had landed on the island of Tortola in the British Virgin Islands. Five additional passengers subsequently identified Laville as a member of the boat's crew.

On September 14, 2004, a federal grand jury returned a three-count indictment charging Laville and Magloire with conspiracy to bring in illegal aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(i) (Count 1); bringing in illegal aliens for financial gain in violation of 8 U.S.C. § 1324(a)(2)(B)(ii) (Count 2); and bringing in illegal aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(i) (Count 3). The District Court later severed Laville's case from that of Magloire, and Magloire was tried and convicted on Counts 2 and 3.

Laville filed *pro se* motions to suppress the identifications and any evidence obtained as a result of his arrest, including statements made to Officer Santos and ICE. On August 16, 2005, the District Court held a suppression hearing at which

4

Laville was represented by counsel. Officer Santos and ICE Agents Levering and Kirk Thomas testified to the circumstances of Laville's arrest, his post-arrest statements, his identification by various passengers, and his ICE interview.

On February 2, 2006, the District Court granted Laville's motion to suppress his post-arrest statements to the VIPD and ICE, but denied his motion to suppress the identifications. The government timely appealed.

## II.

We have jurisdiction over this interlocutory appeal of a suppression order pursuant to 18 U.S.C. § 3731. In reviewing a suppression order, we exercise plenary review over the District Court's legal conclusions, and we review the underlying factual findings for clear error. *United States v. Delfin-Colina*, 464 F.3d 392, 395-96 (3d Cir. 2006).[1]

### A. Laville's Post-Arrest Statements to Officer Santos

The District Court found that Officer Santos arrested Laville without a warrant, and that at the time of the arrest probable cause to believe Laville was an alien smuggler was lacking. At most, the District Court found, there was probable cause to believe only that Laville had entered the United States illegally in violation of 8 U.S.C. § 1325—a misdemeanor. Citing, but misreading, our decision in *United States v. Myers*, 308 F.3d 251 (3d Cir. 2002), the District Court concluded that because the validity of an arrest is determined by the law of the state where the arrest occurred, it need look no further than Virgin Islands statutory law to determine the reasonableness of Laville's arrest under the Fourth Amendment. Under 5 V.I.C. §

---

[1] Laville has filed a *pro se* Rule 28(j) letter raising numerous constitutional objections to his prosecution and to United States immigration policy. As these are neither proper subjects for a Rule 28(j) letter nor proper matters for consideration on interlocutory appeal, we do not consider them.

3562(1), a misdemeanor must be committed in the presence of the officer in order to justify a warrantless arrest. Because the crime of illegal entry was completed before the officers arrived, the District Court reasoned, Santos had no authority under Virgin Islands law to conduct a warrantless arrest. Accordingly, there was a *per se* violation of the Fourth Amendment, and the Court suppressed Laville's post-arrest statements.

Because the government, too, misreads *Myers*, it does not challenge the District Court's conclusion that an arrest that is invalid under territorial law—or state or local law—is unreasonable *per se* under the Fourth Amendment. Instead, the government argues that Laville's arrest was lawful because the crime of illegal entry had not been completed before the officers arrived or, alternatively, that illegal entry is a continuing offense. We need not address these arguments, however, because the reasonableness of Laville's arrest under the Fourth Amendment does not depend on whether it was lawful under territorial law.

**B.     Our Holding in *Myers***

We are compelled, at the outset, to clarify what we did and did not hold in *Myers*. *Myers* concerned a police officer's entry into an apartment in response to a report of possible domestic violence involving a person with a gun, and the subsequent arrest of the defendant because of the officer's suspicion that a crime was underway. We concluded that the officer was justified in entering the apartment but lacked probable cause to arrest the defendant once inside. *Myers*, 308 F.3d at 265. In reaching this conclusion, we painstakingly examined all of the circumstances within the officer's knowledge at the time of the arrest. We did not consider these circumstances in isolation, but necessarily measured them against the potential offenses for which the defendant could conceivably have been charged. We found that the circumstances surrounding the arrest were insufficient to justify a reasonable belief that *any* offense had been committed. *Id.* at 284 (Alarcon, J., dissenting) ("The Majority has concluded that Officer Azzarano did not have probable cause to arrest Myers for any crime.").

6

One of the state-law crimes we considered was the misdemeanor offense of simple assault. In discussing that offense, we noted a Pennsylvania statute authorizing warrantless arrests for misdemeanors only when they are committed in the presence of the arresting officer or when specifically authorized by statute. Noting that the validity of an arrest is determined by the law of the state where the arrest occurred, *id.* at 255, we concluded that the officer's warrantless arrest for simple assault "is not authorized *under Pennsylvania law* unless the record establishes that a simple assault occurred in his presence." *Id.* at 256 (emphasis added). It is important to note that we did not address the relationship between Pennsylvania law and the federal law of probable cause, and we certainly did not hold that the former dictated the latter. Indeed, we made it quite clear that the validity of an arrest under state law must never be confused or conflated with the Fourth Amendment concept of reasonableness, and that the validity of an arrest under state law is at most a factor that a court may consider in assessing the broader question of probable cause.[2] *Cf. Ker v. California*, 374 U.S. 23, 38 (1963) (plurality opinion) (considering whether arrest was reasonable under the Fourth Amendment "notwithstanding its legality under state law"). In conclusion, we held that the totality of the circumstances did not give rise to probable cause to believe that an assault had occurred at all, much less in the arresting officer's presence. *Myers*, 308 F.3d at 258 (noting that the arresting officer's testimony "does not establish a reasonable belief that Myers had assaulted Bennett, and it certainly does not establish any assault in the officer's presence"); *see also id.* at 262 ("[T]he testimony does not support a finding that the officer had a reasonable belief that Myers had been involved in a physical altercation with Bennett.

---

[2] Other courts of appeals are in accord. *See, e.g., United States v. Mikulski*, 317 F.3d 1228, 1232 (10th Cir. 2003); *Pasiewicz v. Lake County Forest Preserve Dist.*, 270 F.3d 520, 527 (7th Cir. 2001); *United States v. Baker*, 16 F.3d 854, 856 n.1 (8th Cir. 1994); *cf. Atwater v. City of Lago Vista*, 532 U.S. 318, 341-45 (2001) (considering state law as one measure of the reasonableness of warrantless arrests for misdemeanors).

7

Likewise, the testimony does not corroborate that a 'struggle occurred or that the officer thought one had.'").

We did *not* hold in *Myers* and, indeed, have never held that an arrest that is unlawful under state or local law is unreasonable *per se* under the Fourth Amendment. Yet, the District Court effectively applied just such a *per se* rule when it held that Santos's warrantless arrest for a misdemeanor that arguably did not occur in his presence violated 5 V.I.C. § 3562(1), the Virgin Islands's misdemeanor-presence statute, and was, therefore, unreasonable under the Fourth Amendment.

A *per se* rule inappropriately draws federal courts into the enforcement of state and local law. By suppressing Laville's post-arrest statements because it found a violation of the Virgin Islands's misdemeanor-presence rule, the District Court was, in effect if not in fact, enforcing territorial criminal procedure, and doing so in a prosecution by the federal government for a violation of federal law. It is well understood, however, that "[m]ere violation of a state statute does not infringe the federal Constitution," and that "[s]tate rather than federal courts are the appropriate institutions to enforce state rules." *Archie v. City of Racine*, 847 F.2d 1211, 1216, 1217 (7th Cir. 1988) (en banc); *see also Johnson v. Fankell*, 520 U.S. 911, 919 (1997) (noting "'the importance of state control of state judicial procedure'" (quoting Henry M. Hart, Jr., *The Relations Between State and Federal Law*, 54 Colum. L. Rev. 489, 508 (1954))); *Poulos v. State of New Hampshire*, 345 U.S. 395, 409 (1953) (stating, in the due process context, that "official failures to act in accordance with state law, redressable by state judicial procedures," are not "state acts violative of the Federal Constitution"). A *per se* rule of reasonableness would inappropriately enlist federal courts in the enforcement of state rules of criminal and judicial procedure.

Application of a *per se* rule could also lead to the creation of different standards governing arrests made by peace officers of different states for the same federal offense. Conceivably, fifty different constitutional standards of arrest, each one dictated by a respective state's positive and decisional law, could result. What would be reasonable and constitutional in one state

could be unreasonable and unconstitutional in another. Meanwhile, federal courts of appeals would be compelled to recognize—and, indeed, to perpetuate—such disparities among the states and territories within their jurisdictions. If, for instance, we were to uphold the District Court's application of a *per se* rule here, we might nevertheless conclude, in some future case, that an otherwise identical arrest occurring in New Jersey is reasonable and constitutional. Such a patchwork of federal constitutional standards, arising as it were from the individual legislative enactments of the various states and territories, is inconsistent with our single federal constitution. *See Martin v. Hunter's Lessee*, 14 U.S. (1Wheat.) 304, 347-48 (1816) (noting "the importance, and even necessity of *uniformity* of decisions throughout the whole United States, upon all subjects within the purview of the constitution").

Moreover, a *per se* rule could well create disparity in the constitutionality of arrests performed by state and federal officers for the same offense within the same state or territory. It is easy to imagine a scenario in which officers of the VIPD and officers of the ICE, working on a joint law-enforcement detail, simultaneously approach a group of suspected illegal aliens under circumstances similar to those presented here. Acting on what they believe to be probable cause, a VIPD officer and an ICE officer make simultaneous, warrantless arrests. If we were to apply a *per se* rule, we would likely be compelled to find that the arrest made by the VIPD officer was unreasonable *per se* and, therefore, unconstitutional, whereas the identical arrest made by the ICE officer was reasonable and constitutional. The Fourth Amendment does not permit, much less require, any such thing.

By engrafting territorial procedural requirements onto the federal constitutional standards governing seizure, the District Court went beyond simply determining the reasonableness of Laville's arrest. Rather, the Court effectively required Santos to be certain that a misdemeanor had been committed, by virtue of having witnessed its commission, and to ensure that conviction was possible. A significant body of caselaw makes clear why any such requirements simply cannot be, and why a Fourth

Amendment determination cannot turn on the exigencies of the law of a particular state or territory or an officer's knowledge of the elements of a particular offense and whether each element has been satisfied. "The test is one of federal law, neither enlarged by what one state may have countenanced nor diminished by what another may have colorably suppressed." *Elkins v. United States*, 364 U.S. 206, 223-24 (1960). As the Supreme Court emphasized in *Draper v. United States*, there is a "'difference between what is required to prove guilt in a criminal case and what is required to show probable cause for arrest or search.'" 358 U.S. 307, 311-12 (1959) (quoting *Brinegar v. United States*, 338 U.S. 160, 173 (1949)). And, as Judge Learned Hand recognized more than sixty years ago, the "'reasonable cause' necessary to support an arrest cannot demand the same strictness of proof as the accused's guilt upon a trial, unless the powers of peace officers are to be so cut down that they cannot possibly perform their duties." *United States v. Heitner*, 149 F.2d 105, 106 (2d Cir. 1945) (quoted in *Draper*, 358 U.S. at 312 n.4); *see also Graham v. Connor*, 490 U.S. 386, 396 (1989) (stating that in determining whether use of force violates the Fourth Amendment, "'reasonableness' . . . must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight").

And it is reasonableness that is the central inquiry under the Fourth Amendment. *United States v. Williams*, 417 F.3d 373, 376 (3d Cir. 2005). "[S]ufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment." *Hill v. California*, 401 U.S. 797, 804 (1971); *see also Locke v. United States*, 11 U.S. (7 Cranch) 339, 348 (1813) (recognizing that probable cause "means less than evidence which would justify condemnation"). Probable cause exists whenever reasonably trustworthy information or circumstances within an arresting officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been or is being committed by the person being arrested. *Draper*, 358 U.S. at 313; *Myers*, 308 F.3d at 255.

10

**C.    Laville's Arrest Was Supported by Probable Cause**

We must, therefore, determine whether Officer Santos's warrantless arrest satisfied the Fourth Amendment's requirement that the arrest be reasonable.  Reasonable suspicion and probable cause are determined with reference to the facts and circumstances within the officer's knowledge at the time of the investigative stop or arrest.  *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004); *Florida v. J.L.*, 529 U.S. 266, 271 (2000).  The arresting officer need not have contemplated the specific offense for which the defendant ultimately will be charged.  The appropriate inquiry, rather, is whether the facts and circumstances within the officer's knowledge at the time of an investigative stop or arrest objectively justify that action. *Devenpeck*, 543 U.S. at 153.

Santos went to the wharf between 7 and 8:00 A.M. to investigate a report, phoned in by Sperber, that a boat had run aground in Christiansted harbor and illegal aliens were coming ashore.  When he arrived at the wharf, Santos observed firsthand that there was in fact a boat stranded in the harbor with a number of people still onboard.  He also met face-to-face with Sperber, who pointed out a group of four individuals sitting nearby on the boardwalk.  These individuals identified themselves to Santos as Cubans who "came into shore" off the boat (App. vol. II at 38), and, as the District Court found, "indicated that other aliens were in the vicinity" (App. vol. I at 6).  Sperber separately informed Santos that more suspected aliens were "around the corner" and offered to point them out.  (App. vol. II at 39.)  Acting on this information, Santos and his fellow officers walked down the boardwalk and around the corner, and, there, found Laville and two companions sitting on a bench.

Taking these facts together with all reasonable inferences, *see Terry v. Ohio*, 392 U.S. 1, 27 (1968), we find that by the time Santos approached Laville and his companions on the boardwalk, he had, at the very least, reasonable suspicion to believe that criminal activity was afoot.  If no further circumstances had existed, Santos would have been justified in performing an investigative stop of Laville and his companions.

11

As it so happened, however, subsequent events elevated Santos's reasonable suspicion to the level of probable cause for an arrest.

When Laville and his companions spotted the approaching police officers, they immediately "stood up and started walking away really fast." (App. vol. II at 39.) Their actions did not evidence an intent simply to go about their business, *see Florida v. Royer*, 460 U.S. 491, 497-98 (1983); rather, the men suddenly, and deliberately, fled. The rapid walking soon gave way to headlong flight: Santos heard a fellow officer exclaim of one of the suspects, "he's running," and personally observed Laville in open flight. (App. vol. I at 6-7.)

It is "well established that where police officers reasonably suspect that an individual may be engaged in criminal activity, and the individual deliberately takes flight when the officers attempt to stop and question him, the officers generally no longer have mere reasonable suspicion, but probable cause to arrest." *United States v. Sharpe*, 470 U.S. 675, 705 (1985) (Brennan, J., dissenting); *see also Peters v. New York*, decided with *Sibron v. New York*, 392 U.S. 40, 66-67 (1968) ("[D]eliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of *mens rea*, and when coupled with specific knowledge on the part of the officer relating the suspect to the evidence of crime, they are proper factors to be considered in the decision to make an arrest."); 2 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 3.6 (4th ed. 2007) ("[I]f there already exists a significant degree of suspicion concerning a particular person . . ., the flight of that individual upon the approach of the police may be taken into account and may well elevate the pre-existing suspicion up to the requisite Fourth Amendment level of probable cause." (internal footnotes omitted)). "Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). Thus, when Laville fled at the sight of the approaching officers, Santos no longer merely had reasonable suspicion to believe that criminal activity was afoot; he now had probable cause to make an arrest. We find that, given the totality of the

12

circumstances, Santos's arrest of Laville was reasonable and did not violate the Fourth Amendment.

**D.      Laville's Custodial Statement to ICE**

Having erroneously found that Laville's arrest was unlawful and that his statements to Santos must be suppressed, the District Court next considered the statement Laville made while in ICE custody.  The District Court determined that a "new arrest" occurred when the VIPD transferred Laville into the custody of ICE.  Finding that the government failed to make an independent showing of probable cause for this new arrest, the District Court ordered that Laville's custodial statement to ICE also be suppressed.

If Laville's arrest had been unreasonable under the Fourth Amendment, then the District Court may have been correct to suppress his custodial statement to ICE as fruit of the poisonous tree.  *See Wong Sun v. United States*, 371 U.S. 471, 484-86 (1963).  We need not decide this question, however, because Laville's arrest was reasonable.  Where his initial arrest by territorial authorities did not violate the Fourth Amendment, ICE was not required to make an independent showing of probable cause before assuming custody.  Such custodial transfers are relatively common in the immigration context, *see, e.g.*, *United States v. Bowley*, 435 F.3d 426, 428 (3d Cir. 2006); *Yang v. Maugans*, 68 F.3d 1540, 1544 (3d Cir. 1995), and none of the authorities cited by the District Court, and none of which we are aware, even implies that a custodial transfer constitutes a "new arrest" requiring a separate showing of probable cause.  *See, e.g.*, *California v. Hodari D.*, 499 U.S. 621, 624-28 (1991) (discussing when a Fourth Amendment "seizure" occurs, but not discussing a transfer of custody); *Payton v. New York*, 445 U.S. 573, 590 (1980) (involving warrantless entry of a home for purposes of making felony arrest); *Sharrar v. Felsing*, 128 F.3d 810, 819-20 (3d Cir. 1997) (same); *United States v. Sanchez*, 509 F.2d 886, 889 (6th Cir. 1975) (involving the Fourth Amendment's particularity requirement for search warrants). We therefore find that Laville's transfer into ICE custody was not a "new arrest" requiring an independent showing of probable

cause, and that the District Court erred in suppressing Laville's subsequent statement to ICE.

## III.

In determining whether an arrest is reasonable under the Fourth Amendment, courts must never lose sight of the fundamental principle that "'reasonable suspicion' and 'probable cause' . . . are commonsense, nontechnical conceptions that deal with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Ornelas v. United States*, 517 U.S. 690, 695 (1996) (some internal quotation marks omitted) (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983)); *see also Sharrar*, 128 F.3d at 818 (stating that courts must "use a 'common sense' approach to the issue of probable cause"). It is not consistent with this principle to determine the reasonableness of an arrest based solely upon the arresting officer's technical compliance with state or local law.

Accordingly, we hold that the unlawfulness of an arrest under state or local law does not make the arrest unreasonable *per se* under the Fourth Amendment; at most, the unlawfulness is a factor for federal courts to consider in evaluating the totality of the circumstances surrounding the arrest. Because the District Court erroneously held that Officer Santos's warrantless arrest was unreasonable *per se* and because it erroneously held that Laville's transfer to ICE custody required a separate showing of probable cause, we will reverse the District Court's order suppressing Laville's post-arrest statements and remand for further proceedings consistent with this Opinion.

McKee, Concurring

I join Judge Barry's analysis and opinion. However, two concerns cause me to write separately. First, I am concerned that the certification the Government filed pursuant to 18 U.S.C. § 3731 may be disingenuous. Second, I think this case can be decided entirely on the basis of our decision in *Yang v. Maugans*, 68 F.3d 1540 (3d Cir. 1995). However, given the apparent confusion arising from our decision in *United States v. Myers*, 308 F.3d 251 (3d Cir. 2002), I join Judge Barry in taking this opportunity to clarify our holding there.

### I. The Government's Certification.

18 U.S.C. § 3731 allows the Government an interlocutory appeal of an order suppressing evidence if, and only if, "the United States attorney certifies to the district court that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding." 18 U.S.C. § 3731, ¶ 2. The Government clearly did not take this appeal for purposes of delay, but I am skeptical of the claim that the evidence the District Court suppressed was "substantial proof of a fact material" to the charges against Laville, as it must be if we are to have jurisdiction over an interlocutory order.

Laville was charged with illegally bringing aliens into the United States in violation of 8 U.S.C. § 1324(a)(1)(A)(I), doing so for financial gain in violation of 8 U.S.C. § 1324(a)(2)(B)(ii), and conspiring to do so in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I). As the majority explains, after he was apprehended by Officer Santos, Laville said that he was from Dominica, and that he had been a crew member on the stranded boat. The day after he was apprehended, Santos was turned over to agents from Immigration Customs and Enforcement, and he repeated those statements to them. He added only that he thought he had landed on Tortola, an island in the British Virgin Islands. Those are the statements that the District Court suppressed, and that is the evidence that purportedly constitutes "substantial proof of a material fact" in Laville's prosecution.

8 U.S.C. § 1324 makes it a crime for anyone to knowingly "bring . . . [an alien] to the United States . . . at a place other than a designated port of entry . . . ." 8 U.S.C. § 1324(a)(1)(A)(I). The various subsections Laville was charged with violating specify penalties for bringing aliens into the United States, doing

15

so for financial gain, or conspiring to do so. The citizenship or residence of the person who illegally brings aliens into the United States is irrelevant. A United States citizen can be convicted of illegally bringing aliens into the United States (and the related offenses) the same as a legal permanent resident or an illegal alien. The Government need only prove that a defendant brought illegal aliens into the United States at a location other than "a designated port of entry," and that he/she did so knowingly. I therefore fail to see how Laville's citizenship can acquire the materiality the Government has claimed by filing this appeal and the concomitant certification under § 3731. Laville's statement that he was a crew member is relevant because it establishes that he actually facilitated the passengers' illegal arrival into the United States and creates an inference that he did so for financial gain (as a paid crew member). However, the Government did not need his post-arrest statements to establish that he was a crew member. As Judge Barry notes, several of the passengers identified Laville and a co-defendant as the boat's operators. The post-arrest statements that are the subject of this interlocutory appeal may flush out a bit of detail and provide some colorful background, but they are certainly not "substantial proof of a fact material in the proceeding." I therefore doubt that the § 3731 certification was afforded the consideration Congress intended. Rather, it appears to have been reflexively filed in order to challenge a ruling the Government disagreed with.

I realize that we are not in a position to understand all of the dynamics of this prosecution, and that there may be an explanation for the Government's certifying that Laville's apparently superfluous statements are material to his prosecution that is not evident on appeal. However, the record certainly does not suggest any such explanation, and the Government was not able to provide one when asked during oral argument.[3]

---

[3] For example, it is conceivable that the Cuban witnesses were either unavailable or uncooperative. In that event, Laville's admission that he operated the boat would become crucial to the Government's proof. However, nothing on this record suggests that is the case, and the Government offered no such explanation when queried about the certification during oral argument.

I also realize that we do not look behind the United States Attorney's certification under § 3731, nor question its veracity. *See Gov't of V.I. v. Hodge*, 359 F.3d 312, 325 (3d Cir. 2004) ("The United States Attorney's word is enough; the reviewing court does not consider the truth of the certification."). Nevertheless, I think it is clear that the Congress did not intend the certification to function only as a procedural calisthenic that the Government can employ whenever it disagrees with the District Court's suppression ruling. I hope that the Government has not regarded it as such here.

## II. The Arrest Was Legal Even Under Virgin Islands Law.

As Judge Barry explains, the District Court concluded that Officer Santos did not have probable cause to arrest Laville for smuggling aliens. The court believed that Santos had, at most, probable cause to believe Laville had entered the United States illegally in violation of 8 U.S.C. § 1325. Under Virgin Islands law, local law enforcement officers have authority to arrest for violations of federal immigration laws. *See, e.g., United States v. Santana-Garcia*, 264 F.3d 1188, 1193-94 (10th Cir. 2001). Nevertheless, the court suppressed Laville's statements because illegal entry into the United States is a misdemeanor. Under the law of the Virgin Islands, Officer Santos could not make a warrantless arrest for a misdemeanor unless the offense was committed in his presence.[4] The District Court erroneously concluded that that requirement governed the admissibility of the suppressed evidence.

"The definition of 'entry' as applied for various purposes in our immigration laws was evolved judicially . . .", *Rosenberg v. Fleuti*, 374 U.S. 449, 453 (1963). As used in immigration law, entry requires more than physical presence in the United States; it also requires freedom from official restraint. *United States v. Pacheco-Medina*, 212 F.3d 1162, 1164 (9th Cir. 2000). The requirement that the alien be free from official restraint to accomplish an entry into the United States applies to the crime

---

[4] 5 V.I.C. § 3562 provides: "A peace officer may make an arrest in obedience to a warrant delivered to him, or may, without a warrant, arrest a person – (1) for a public offense committed or attempted in his presence."

of illegal entry in violation of 8 U.S.C. § 1325, as well as the crime of illegal re-entry under 8 U.S.C. § 1326. *See United States v. Vasilatos*, 209 F.2d 195, 197 (3d Cir. 1954) (illegal re-entry); *United States v. Gonzalez-Torres*, 309 F.3d 594, 598 (9th Cir. 2002) (illegal entry and illegal re-entry); *Pacheco-Medina*, 212 F.3d at 1164-65 (illegal re-entry); *United States v. Angeles-Mascote*, 206 F.3d 529, 531 (5th Cir. 2000) (illegal re-entry).

In *Yang v. Maugans*, 68 F.3d 1540 (3d Cir. 1995), we had to determine if an entry had been accomplished by aliens on a smuggling ship that ran aground off the coast of New York. Some of the 300 passengers on that ship managed to swim ashore before being apprehended, and we had to decide if their physical presence in New York effectuated an entry into the United States within the meaning of then-section 101 of the Immigration and Nationalities Act.[5]   The police had responded immediately and they had cordoned off the area of the beach where the aliens had landed. None of the aliens ever left the beach area, and they were all arrested within thirty minutes of their arrival.

Quoting from the BIA's decision in *Matter of G-*, Int. Dec. 3215, at 5-7 (BIA 1993), we explained that an entry into the United States requires: "'(1)  crossing into the territorial limits of the United States, i.e., physical presence; (2)(a) inspection and admission by an immigration officer, or (b) actual and intentional evasion of inspection at the nearest entry point; and (3) freedom from official restraint.'"   68 F.3d at 1545.   We held that the aliens never entered the United States because they never satisfied the third requirement; they were never free from official restraint.  We explained:

---

[5] Resolution of that issue determined the kind of hearing the aliens were entitled to.  An alien who has "entered" the United States is entitled to a removal proceeding, while an alien who has not "entered" can be refused admission through a summary exclusion proceeding.  In a removal proceeding, the alien receives many advantages not available to an alien in an exclusion proceeding, including advance notice of the charges, appeal to an appellate court, and the right to a country of designation. *Yang*, 68 F.3d at 1547.

> When an alien attempts to enter the United States, the mere fact that he or she may have eluded the gaze of law enforcement for a brief period of time after having come upon United States territory is insufficient, in and of itself, to establish freedom from official restraint.

*Id.* at 1550.   Thus, in *Yang* as here, none of the defendants was ever free from official restraint once they touched shore.

> None of the petitioners ever left the beach area, which was teeming with law enforcement activity soon after the [the smuggling vessel] ran aground. Nor were any of the petitioners free to . . . go at large and mix with the general population.  Far from indistinguishably mixing with the general population, petitioners either were apprehended shortly after coming ashore, or were brought into custody as a result of immediate and intense law enforcement efforts.  We therefore conclude[d] that the petitioners were never free from official restraint.

*Id.* (Ellipsis in original, internal citation omitted).

Although the police response here was not as intense as the response in *Yang*, I do not believe that the difference rises to the level of a legal distinction for purposes of determining if Laville had managed an "entry" under our immigration laws. Laville was never free to "go at large and mix with the general population," he was "apprehended shortly after coming ashore," and he was "brought into custody as a result of immediate and [relatively] intense law enforcement efforts."  Given the holding in *Yang*, the District Court should have concluded that the offense of illegal entry was committed in the presence of Officer Santos; it clearly was.  Accordingly, Laville's post-arrest statements should not have been suppressed.[6]

---

[6] As is evident from Judge Barry's analysis, my discussion in no way suggests that the legality of Laville's arrest turns on whether a misdemeanor was committed in Officer Santos'

STAPLETON, <u>dissenting</u>:

I read our decision in *United States v. Myers*, 308 F.3d 251 (3d Cir. 2002), in the same manner as did the District Court and the parties in this case.

In *Myers*, we began our analysis by observing: "The validity of an arrest is determined by the law of the state where the arrest occurred. *See Ker v. California*, 374 U.S. 23, 37 (1963) (plurality opinion)." 308 F.3d at 255. The cited portion of *Ker* reads as follows:

> This Court, in cases under the Fourth Amendment, has long recognized that the lawfulness of arrests for federal offenses is to be determined by reference to state law insofar as it is not violative of the Federal Constitution. *A fortiori*, the lawfulness of these arrests by state officers for state offenses is to be determined by California law.

*Ker*, 374 U.S. at 37 (citations omitted).

No one contended in *Myers* that a misdemeanor presence rule was "violative of the Federal Constitution,"[7] and we went

---

presence. As Judge Barry explains, that Fourth Amendment inquiry turns on whether Officer Santos had probable cause to believe that Laville was committing a crime. It is not the fact that Laville was committing a misdemeanor in the officer's presence that validates this arrest. Rather, the totality of the circumstances, including Officer Santos' reasonable suspicion when he saw Laville, establishes probable cause to arrest as required under the Fourth Amendment. That analysis can not be governed by local law.

[7]It is, of course, true that an arrest which violates the Federal Constitution is not a legal one notwithstanding its legality under state law. In the portion of *Ker v. California*, 374 U.S. 23 (1963),

20

on in *Myers* to hold as follows:

>    Under Pennsylvania law, simple assault is a
>    misdemeanor.  As noted above, Pennsylvania law
>    governs the validity of Myers' arrest.  The
>    Pennsylvania legislature has specifically limited
>    the authority of police officers to make warrantless
>    arrests for misdemeanor offenses.  An officer may
>    conduct a warrantless arrest for a misdemeanor
>    only if the offense is committed in the presence of
>    the arresting officer or when specifically
>    authorized by statute.  Officer Azzarano arrested
>    Myers without a warrant.  Therefore, Azzarano's
>    arrest for simple assault is not authorized under
>    Pennsylvania law unless the record establishes that
>    a simple assault occurred in his presence.

*Myers*, 308 F.3d at 256 (citations omitted).

Applying this law to the facts of *Myers*, we reversed the district court and held that it must grant the motion to suppress because the officer had no reasonable ground to believe that a simple assault was occurring in his presence.  In our concluding paragraph on this issue, we summarized our holding as follows:

>    Based upon our review of this record we
>    conclude that a finding that an assault was
>    "ongoing" in the officer's presence is clearly
>    erroneous.  We therefore hold that the government
>    failed to satisfy its burden of establishing that the

---

referenced by the Court, for example, the plurality opinion "examine[d] [an] arrest to determine whether, notwithstanding its legality under state law, the method of entering the home may offend federal constitutional standards of reasonableness and therefore vitiate the legality of an accompanying search." *Id.* at 38. Applying the misdemeanor presence rule to determine the validity of a Virgin Islands arrest, however, does not infringe on any right created by the Fourth Amendment.

police had probable cause to arrest Myers for simple assault.

*Id.* at 261.

Essential to this holding was a conclusion that the government could not rely upon information supplied by a third party shortly before the arrest:

> Azzarano testified that he was suspicious because hiding behind a door at the approach of a police officer is inconsistent with a "simple argument." Azzarano explained that he pointed his gun at the door Myers was hiding behind "because I believed he had a gun in his possession *based upon the fact that the little girl had said so.*" *Id.* at 71a (emphasis added). He did not base his conclusion that Myers was armed on anything he heard or saw after he entered the residence.

*Id.* at 261.

Here, as in *Myers*, local law provides that a warrantless arrest for a misdemeanor is valid only if the misdemeanor occurred in the presence of the arresting officer. Here, as in *Myers*, the government is not entitled to rely on information supplied to the arresting officer by a third party. This is the prevailing misdemeanor presence rule. *See* 2 Wayne R. LaFave, et al., *Criminal Procedure* §3.5. If we apply *Myers* to the facts of our case, I believe the challenged evidence must be suppressed. Based on his own observation, Officer Santos had no reasonable ground for believing that Laville was an alien, much less an illegal one.[8]

This is not to say that, in the absence of *Myers*, I would find its holding to be the current law of the land. I conclude

---

[8]Whether and when Laville effected an "entry" is, accordingly, not of controlling significance.

22

only that I do not regard myself free in this case to depart from what I understand to be the holding in *Myers*.

My reading of *Myers* is not the only reason for my dissent, however. Even in the absence of an applicable misdemeanor presence rule, I would reach the same conclusion. In my view, the totality of the circumstances within the arresting officer's knowledge was not sufficient to warrant a person of reasonable caution to conclude that Laville had committed or was committing an offense.

As the law regarding information from informants illustrates, even in the absence of a misdemeanor presence rule, an officer of reasonable caution does not rely upon the unsupported belief of someone else who does not appear to have, and does not purport to have, a reasonable basis for his belief. *See Illinois v. Gates*, 462 U.S. 213, 230 (1983) (whether information supplied by an informant supports probable cause depends on informant's veracity, reliability, and basis of knowledge, among other considerations); 2 Wayne R. LaFave, *Search & Seizure* § 3.4 (noting that although *Gates* dealt with information obtained from informants who are part of the "criminal milieu," it is "likewise appropriate to give separate consideration to the matters of veracity and basis of knowledge . . . [i]n cases where the police have acted or seek authorization to act primarily upon information from the victim of or a witness to a crime"). This is relevant here because one cannot determine whether someone is an alien or a non-alien by simply looking at him. Nor can one determine whether someone is an illegal alien or a legal alien by simply looking at him. Mark Sperber thus not only did not purport to have, but also did not appear to have, a reliable basis for believing that Laville was anything other than a citizen or a non-citizen with a right to be present in the United States.

When Officer Santos stood with Mark Sperber on the Christiansted wharf, he had reliable information that a sailing vessel had run aground and that some on board had come on shore. I am willing to assume for present purposes that Santos also had reliable information that Laville had come ashore from

23

that vessel. But that was the sum total of the relevant, reliable information Santos possessed when Laville was pointed out to him. Santos did not question Laville prior to his arrest, and, while Sperber did assert to Santos that Laville was an "illegal," Santos had no basis for believing this was trustworthy information.[9] Sperber did not purport to have spoken with Laville, and there was no apparent way Sperber could have learned that Laville was an alien, much less an illegal alien. Indeed, the government conceded as much when questioned by the District Court. It conceded that, even if Santos had obtained reliable information that Laville was from Dominica, he would not have had probable cause to believe he was in violation of the immigration laws:

> THE COURT: Would you concede that knowledge that someone is from Cuba or Dominica does not in and of itself give rise to probable cause that someone is in violation of immigration laws? Would you concede that?
>
> MR. ANDREWS: I would concede, Judge.

App. at 73-74.

In summary, all that Santos reliably knew when Laville was pointed out to him was that Laville was a person who had come ashore from a vessel in distress and that clearly did not provide him with probable cause to believe that Laville had committed or was committing a crime.

---

[9]Contrary to the Court's suggestion, Sperber's tip was not corroborated by the Cubans. The Cubans did not tell Santos that "other illegal aliens were in the vicinity," *see* Maj. Op. at 14. In fact, the Cubans never advised Santos that they themselves were illegal aliens; they simply told Santos that they were from Cuba and had come ashore from the boat. *See* App. at 38-39. Santos could not infer from this simple admission that the Cubans were illegal aliens, as the government frankly conceded to the District Court. *See* text, *infra*.

The only additional fact Santos knew at the time of Laville's arrest was that Laville had attempted to avoid contact with law enforcement officers. I find this conduct too ambiguous in this context to provide a basis for more than speculation.

I would suppress the statement given to the ICE as well as the statement given to the Virgin Islands police as "fruit of the poison tree."

Accordingly, I would affirm the ruling from which the government appeals.