**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————————

18-1513

———————————

UNITED STATES OF AMERICA

v.

MICHAEL KING,

Appellant

———————————

On Appeal from the District Court
for the District of Delaware
(D. Del. 1-16-cr-00004-001)
Honorable Gregory M. Sleet, U.S. District Judge

———————————

Submitted Under Third Circuit L.A.R. 34.1(a)
March 19, 2019

Before: SHWARTZ, KRAUSE, and BIBAS, *Circuit Judges*

(Opinion filed: April 2, 2019)

———————————

**OPINION**[*]

———————————

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

KRAUSE, *Circuit Judge*.

Defendant-Appellant Michael King appeals the District Court's decision to deny his motion to suppress evidence. Because we conclude that the State Trooper who seized the evidence had reasonable suspicion to stop and frisk King and probable cause to arrest him, we will affirm.

## I. Background

In December 2015, a Delaware State Trooper ("the Trooper") responded to a dispatch reporting "fighting" and disorderly conduct between two men inside a restaurant. App. 62. When he arrived at the restaurant, the Trooper spoke with the restaurant's host, who acknowledged that he had called the police and "immediately pointed" to a man near the front window of the restaurant, later identified as Michael King. App. 66. King "immediately stop[ped] leaning on the front glass window" and "walk[ed] towards" the doorway where the Trooper was standing. *Id.* But when the Trooper put his "arm out across the doorway" and told King to stop so he could talk with him, King "immediately turned around" and walked "at a fast pace" toward the area of the restaurant where patrons were dining, ignoring the Trooper's "multiple" calls for him to stop. App. 66-67. At some point, "to make sure [that King] didn't walk . . . any further toward anyone sitting inside the restaurant," the Trooper grabbed the hood of King's sweatshirt and led him out the door. App. 67.

Once outside, the Trooper asked King for identification. King did not turn over the Delaware ID card that was visible in his wallet, but told the Trooper his name and asked the Trooper not to "run" him. App. 69. During this conversation, the Trooper

2

observed signs of drunkenness, and, despite the Trooper's "many" requests for King to keep his hands visible, King repeatedly reached inside his pockets. *Id.*

Concerned about what King might be hiding there, the Trooper began to frisk him, but King pushed away the Trooper's hands and began to back away. The Trooper stopped him by pushing King against his patrol car and ordering him to keep his hands behind his back. Again, however, King moved away, and the two circled the Trooper's patrol car until the Trooper grabbed the back of King's sweatshirt, causing it to lift up and reveal a gun tucked into King's waistband. The Trooper then tased King, retrieved the gun, and kept him restrained pending the arrival of backup.

After the matter was referred to federal authorities, a grand jury indicted King for possessing a firearm as a felon, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2). King moved to suppress the firearm, but the District Court denied his motion, so he pleaded guilty while preserving his right to appeal the denial of his motion. This timely appeal followed.

## II.    Discussion[1]

On appeal, King argues that we must reverse the District Court and suppress the firearm because the Trooper did not have: (1) reasonable suspicion to stop King; (2) reasonable suspicion to frisk King; or (3) probable cause to arrest King. "In reviewing a suppression order, we exercise plenary review over the District Court's legal conclusions,

---

[1] The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291.

3

and we review the underlying factual findings for clear error." *United States v. Laville*, 480 F.3d 187, 190 (3d Cir. 2007) (citation omitted). We address each issue in turn.

## A. The Reasonableness of the Stop

The Fourth Amendment permits an officer to "conduct . . . brief, investigatory stop[s]," *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000), known as *Terry* stops, to investigate both "past criminal activity" and "imminent or ongoing crim[inal activity]," *United States v. Hensley*, 469 U.S. 221, 228 (1985). During such a stop, an officer may conduct a safety frisk when there are "reasonable grounds to believe that [a suspect] [i]s armed and dangerous." *Terry v. Ohio*, 392 U.S. 1, 30 (1968). We use the "same test" for stops based on completed crime and stops based on imminent or ongoing crime and assess their reasonableness by "balanc[ing] the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion." *Hensley*, 469 U.S. at 228. Under this test, an officer may stop a person to investigate imminent or ongoing crime when she "has a reasonable, articulable suspicion that criminal activity is afoot." *Wardlow*, 528 U.S. at 123. But, in recognition of the fact that "[p]ublic safety may be less threatened by a suspect in a past crime," the Court has indicated that "[t]he factors in the balance may be somewhat different" when the stop is based on past crime rather than imminent or ongoing crime. *Hensley*, 469 U.S. at 228.

Regardless of the stop's purpose, we evaluate its constitutionality by first identifying the moment of seizure and then determining whether the "totality of the circumstances" at that moment justified the stop. *United States v. Cortez*, 449 U.S. 411, 417 (1981); *see United States v. Lowe*, 791 F.3d 424, 430 (3d Cir. 2015) (describing our

duty to first "pinpoint the moment of the seizure and then determine 'whether that seizure was justified by reasonable, articulable facts known to [the officer] as of that time that indicated that [the suspect] was engaged in criminal activity'" (citation omitted)). "A seizure occurs when there is either (a) 'a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful,' or (b) submission to 'a show of authority.'" *United States v. Brown*, 448 F.3d 239, 245 (3d Cir. 2006) (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991)).

Here, King was not seized when the Trooper blocked the doorway and ordered King to stop, as King argues, because King walked away and thus did not submit to that show of authority. *See United States v. Waterman,* 569 F.3d 144, 146 (3d Cir. 2009) (holding that a suspect facing police officers with weapons drawn who reached toward his waistband and then retreated did not submit and thus was not seized). Instead, King was seized when the Trooper grabbed his sweatshirt and removed him from the restaurant, which constituted an "application of physical force to restrain movement." *Brown*, 448 F.3d at 245. And at that moment, the Trooper had the requisite "reasonable, articulable suspicion that criminal activity [wa]s afoot" to stop King. *Wardlow*, 528 U.S. at 123.

While King contends it was apparent that the disorderly conduct was in the past and "there was no threat of escalating harm," Appellant Br. 26, so that the balance of factors for stops investigating "past criminal activity" would apply to the seizure, the Trooper's observations prior to the seizure would lead a reasonable officer to suspect that criminal activity was still "imminent or ongoing," *Hensley*, 469 U.S. at 228. After the

5

restaurant's host pointed to King, King "immediately" walked toward the restaurant's exit, ignoring the Trooper's requests to stop. App. 66. At that point, the Trooper reasonably suspected King's involvement in a fight, did not know the whereabouts of the other individual involved in that fight, had observed King's sudden and evasive movements, and was concerned about King moving "any further toward anyone sitting inside the restaurant." App. 67. So, when King next made a "fast pace[d]" retreat towards other patrons in the restaurant, *id.*, the Trooper had good reason, based on "commonsense judgments . . . about human behavior," *Johnson v. Campbell*, 332 F.3d 199, 206 (3d Cir. 2003) (citation omitted), to suspect King's involvement in imminent or ongoing criminal activity.[2]

## B. The Reasonableness of the Frisk

The frisk outside of the restaurant likewise comported with the Fourth Amendment. "The reasonable suspicion that justifies the *Terry* stop of a suspect also justifies a subsequent protective frisk of that suspect, where [an] officer[] ha[s] reason to believe that the suspect may pose a danger to the officer[]." *Lowe*, 791 F.3d at 430. That was the case here.

When the Trooper confronted King outside the restaurant, King was drunk and unwilling to provide his Delaware ID card, King did not want the Trooper to "run" him, and King kept reaching into his pockets, despite instructions to the contrary. App. 69.

---

[2] While King contends that a *Terry* stop may never be used to investigate a completed misdemeanor, we need not decide that issue because we conclude that the Trooper justifiably stopped King on suspicion of imminent or ongoing criminal activity.

These types of behaviors—a suspect's "furtive hand movements and refusal to obey the officers' orders,"[3] his "refus[al] to identify himself . . . and refus[al] to remove his hand from his pocket,"[4] or his obvious intoxication[5]—each support "reasonable grounds to believe that [the suspect] was armed and dangerous." *Terry*, 392 U.S. at 30. Here, it was the combination of these behaviors, in addition to those supporting the initial stop, that reasonably led the Trooper to be "concerned about a weapon" and to believe King might have "something to hide." App. 69. And because the Trooper observed these behaviors before he began frisking King, that frisk was conducted on the basis of reasonable suspicion.

### C. Probable Cause to Arrest

Finally, we reject the notion that King was arrested before the Trooper had probable cause. While King does not contest that there was probable cause once the Trooper saw the firearm, King posits that the arrest occurred earlier, at the moment when the Trooper pushed him against the patrol car. We disagree because the Trooper's action

---

[3] *United States v. Moorefield*, 111 F.3d 10, 14 (3d Cir. 1997).

[4] *United States v. Mouscardy,* 722 F.3d 68, 75 (1st Cir. 2013); *see United States v. Campbell*, 549 F.3d 364, 371–372 (6th Cir. 2008) (relying on a suspect's "lack of identification" as a factor supporting a frisk).

[5] *See Michigan v. Long*, 463 U.S. 1032, 1050 (1983) (considering intoxication as a factor supporting reasonable suspicion to conduct a frisk); *United States v. Patton*, 705 F.3d 734, 739 (7th Cir. 2013) (citing alcohol consumption as a "reason to be concerned that [someone] might do something unpredictable, unwise, and dangerous").

in briefly restraining King against the car was still within the bounds of an investigatory stop.

"[W]hen police officers make an investigative stop, they may take such steps as are reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *United States v. Edwards*, 53 F.3d 616, 619 (3d Cir. 1995) (citation omitted). Though there may be "difficult line-drawing problems in distinguishing an investigative stop from a *de facto* arrest," *United States v. Sharpe*, 470 U.S. 675, 685 (1985), an officer may use intimidation and brief physical restraint without necessarily transforming the encounter into an arrest, *see Edwards*, 53 F.3d at 620 ("[W]e distinguish the length of time a suspect may be detained before the detention becomes a full-scale arrest . . . ."); *Baker v. Monroe Twp.*, 50 F.3d 1186, 1193 (3d Cir. 1995) ("There is no per se rule that pointing guns at people, or handcuffing them, constitutes an arrest"). Ultimately, we "must examine the reasonableness of the detention, particularly whether the police were diligent in accomplishing the purpose of the stop as rapidly as possible." *Baker*, 50 F.3d at 1192.

Here, the Trooper's action in pushing King against the car was "reasonably needed to effectuate th[e] purpose[]" of the stop and frisk and thus did not convert the encounter into an arrest. *Sharpe*, 470 U.S. at 685. King was demonstrably uncooperative and the physical restraint involved in pushing him against the car was minimal and brief—as evidenced by the fact that King continued to move away and circle the car shortly after he was pushed—and reasonably calibrated to "obtain control" and "finish the pat down." App. 72. It was not until after the Trooper saw the gun in King's waistband, at which

8

point the Trooper had probable cause, that King was tased and restrained to the point of constituting an arrest.

## III.    Conclusion

For the foregoing reasons, we will affirm the District Court's denial of King's motion to suppress.